## MASTERSON et al., Appellants, v. ST. LOUIS TRANSIT COMPANY.

### In Banc, May 30, 1907.

1. **NEGLIGENCE: Excessive Speed: Instruction.** Where the petition counted on a dangerous rate of speed and speed in excess of the ordinance rate of ten miles, an instruction for defendant which required the jury to find "either that defendant operated its car in excess of the speed of ten miles an hour, or at such a speed which under the evidence and circumstances amounted to negligence," did not authorize defendant to run its car at ten miles per hour regardless of the circumstances.

2. ———: **Instruction: Cause of Accident: Sounding Gong.** Where several acts of negligence are charged, either one of which caused or contributed to cause the accident, the jury ought not to be instructed that unless they find one particular act to have been the sole cause they should disregard it entirely. But where the defendant's instruction follows exactly the charge in the petition in that respect, it is not error. Where it is charged that failure to sound the bell caused the boy to be killed, it is not · error to give an instruction for defendant requiring the jury to find that failure to sound the bell was negligence and that such negligence was the cause of the child's death. Furthermore, in this case, where a child eleven years old ran from the sidewalk, in the middle of the block, ten feet and eight inches to the track, and there stumbled and fell upon the track, it is difficult to see what good the sounding of the gong, whether the car was twenty or fifty feet away, would have done in the emergency.

3. ———: **Perilous Position: On Lookout.** An instruction that tells the jury that unless the injured boy "was in a position of peril a sufficient length of time to have enabled those in charge of defendant's car to stop, or so check the same as to avoid striking and killing him, in the exercise of ordinary care on

their part, and with the means and instrumentalities at hand,"
etc., does not leave out of view the duty of the motorman to
be on the lookout to discover the peril, but in effect concedes
that he saw the danger as soon as it occurred and excuses him
only on the ground that he did not have time after it occurred
to stop the car.

4. ———: **Stopping Car: Dragging Injured Person.** An instruction
which tells the jury that if "plaintiffs' son undertook to run
across the street" near the middle of a block "in front of defend-
ant's moving car, and while the same was so close to him as to
prevent the motorman, in the exercise of ordinary care, with
the means and appliances at hand, from stopping, or checking
his car so as to avoid striking him, whereby their said son was
killed," etc., is not erroneous in ignoring defendant's liability for
its charged act of negligence in dragging the child after he
was struck, if there was no evidence that the boy lost his life
in consequence of having been dragged after he was struck,
although there was evidence that he was dragged more than
fifty feet.

5. ———: ———: ———: **Excessive Speed.** Nor is such instruc-
tion erroneous because it failed to require the jury to take into
consideration the charge that the car was being run at an ex-
cessive and negligent rate of speed, if plaintiffs' own instruc-
tion predicated their right to recover solely on the ground of
failure to stop the car and on that theory tried the case.

6. **EVIDENCE: Conclusion of Witness.** Conclusions of the wit-
ness, as, "There was a sunken place in the bricks there which
evidently caused the boy to stumble," and, "The motorman
was looking north as his car went east, and evidently was talk-
ing to someone," are incompetent, and properly excluded.

7. ———: **Refusal to Testify Before Coroner: Self-Incrimination.**
The motorman, whose car struck and killed a boy eleven years
old, was asked if he testified at the coroner's inquest, and he
said he had not. He was asked if he was present and said yes.
Plaintiffs then produced a transcript of the evidence taken at
the inquest, from which it appeared that the motorman was
sworn and said: "I don't care to testify; I might incriminate
myself." *Held*, that this transcript, on the trial of the damage
case, was properly excluded. Whether or not it would have
tended to impeach him, it was his high constitutional privilege
to refuse to testify at the coroner's inquest for the reason giv-
en, and the court will not put him under the suspicion of carry-
ing a guilty conscience because he then exercised a privilege
the Constitution itself gave him the right to invoke.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Blevins,* Judge.

**AFFIRMED.**

*Richard F. Ralph* and *Barclay, Shields & Fauntleroy* for appellants.

(1) (a) Instruction 9 given for defendant is entirely erroneous because it directs a verdict for defendant on the sole fact or finding that plaintiffs' son was guilty of negligence in running across the street in front of the car, so close as to prevent the motorman by ordinary care from avoiding striking him. The instruction ignores the issue of defendant's liability growing out of the facts supporting plaintiff's allegation that, after the boy was caught by the car, he was dragged an unnecessary distance and thereby killed, because of want of ordinary care in the operator of the car after the child was hit. Under the ninth instruction the defendant was exonerated by a fact which did not control the issue of defendant's negligence in failing to use care to stop the car after the boy was helpless beneath it, and could no longer avoid danger by his own act. The dragging was the proximate cause of his death (according to the testimony) yet the said ninth instruction for defendant excluded any finding to that effect, as a matter of law. McMahon v. Ex. Co., 132 Mo. 641; Burnham v. Railroad, 56 Mo. 338; Shanks v. Traction Co., 101 Mo. App. 702; Klockenbrink v. Railroad, 172 Mo. 678; Scullin v. Railroad, 184 Mo. 695; Cin. H. & D. Co. v. Kassen, 49 Ohio St. 230. (b) The instruction is further erroneous because, even if defendant used ordinary care to stop the car and could not do so, "with the means and appliances at hand," on account of its violation of law in running at a dangerous and excessive rate of speed (above the ordinance limit of ten miles an hour) defendant would be liable,

notwithstanding the facts found as recited in said instruction. A person cannot with impunity violate law and put himself and his property in a condition to be dangerous to the lives of others, and then claim immunity from the consequences on the fallacy that he then did the best he could to avert them. He is responsible for the natural and proximate consequences of his original unlawful act. K. C. Co. v. Stoner, 51 Fed. 649 (10 U. S. App. 256); Morgan v. Cox, 22 Mo. 373; Karle v. Railroad, 55 Mo. 476; 21 Am. and Eng. Ency. Law (2 Ed.), 480, 481; Clark v. Chambers, 3 App. Cas. (L. R.) 377. (2) The instruction given by the court marked 7 was erroneous in ignoring the issue arising from the facts of the dragging of the boy for a distance in excess of that needed to stop the car by the use of ordinary care after the boy was entangled in the machinery. It is error to give an instruction which completely ignores and obliterates a material issue in the case, as was here done. Bunyan v. Railroad, 127 Mo. 12; Holden v. Railroad, 177 Mo. 456. (3) The offer of the transcript of the motorman's refusal to testify at the coroner's inquest was excluded by the trial court, contrary to an elemental rule of evidence by which a party is allowed to prove statements or acts elsewhere, contradictory of testimony given by an adverse witness, on laying proper foundation. 1 Greenl. Evid., sec. 462; State v. Downs, 91 Mo. 19; Stacy v. Railroad, 72 Wis. 331; 10 Ency. Pl. & Pr., 287; Selensky v. Railroad, 94 N. W. 272; Handy v. Canning, 166 Mass. 107; State v. Merriman, 34 S. Car. 16; Hamilton v. Coal Co., 108 Mo. 365. The proof offered was also competent to show the defective memory of the witness by proving he had testified at the inquest, when he swore he had not. It is certainly proper on cross-examination to test the accuracy of memory of a witness, and especially of a witness who is the central figure in the scene from which the litigation arises.

*Boyle & Priest* and *Edward T. Miller* for respondent.

The court did not err in giving defendant's instruction numbered 9. Boyd v. Railroad, 105 Mo. 371; Holwerson v. Railroad, 157 Mo. 216; Tanner v. Railroad, 161 Mo. 497; Moore v. Railroad, 176 Mo. 528.

IN DIVISION ONE.

VALLIANT, P. J.—Plaintiffs' son, who was about eleven years old, was struck and killed by one of defendant's street cars and plaintiffs sue to recover damages under section 2864, Revised Statutes 1899, alleging that the accident was caused by the negligence of defendant's motorman operating the car. On the trial the verdict of the jury was for the defendant, judgment in accordance with the verdict, and the plaintiffs have appealed.

The petition alleges that while plaintiffs' son was crossing the street, he accidently stumbled and fell on the track of defendant's railroad, and while he was in a condition of danger and endeavoring to get off the track, a car of defendant's ran upon him and dragged him more than fifty feet, in consequence of which he received injuries of which he died. Following the general averment there are six specifications of negligence:

1. Running the car at a dangerous rate of speed, so that it was not under reasonable control;

2. Running at a rate in excess of fifteen miles an hour in violation of a city ordinance forbidding the running faster than eight miles an hour;

3. Failing to give signals by bell to warn the boy of the approaching car;

4. Failing to use ordinary care to discover the boy on the track in time to avoid the accident;

5. Failing to use ordinary care to stop the car after discovering him in a position of danger; and,

6. Failing to stop the car after the collision, so as to avoid dragging him along the track under the car.

The answer was a general denial and a plea of contributory negligence.

Plaintiffs' evidence tended to prove as follows:

Defendant operated a double-track street railroad running east and west in Laclede avenue. On May 25, 1902, about 7:30 o'clock in the evening, plaintiffs' son, ten years, eleven months and three days old, was in the act of crossing the street from the south to the north side; when in the south track of the railroad he stumbled and fell, and while he was endeavoring to get up he was struck by an east-bound car, carried under the car and dragged along the track a distance estimated by various witnesses from sixty to ninety-two feet, when the car was stopped. The child received such injuries that he died soon after. When he fell on the track the car was fifty to fifty-five feet distant, no bell was being rung, the car was going twenty to twenty-five miles an hour, the motorman was not looking forward, his face was towards the north and he seemed to be talking to someone on the front platform. The city ordinance limited the rate of speed of the car at that place to ten miles an hour. A witness for plaintiffs who had been in the employ of the defendant, and was the conductor of the car when this accident occurred, but who was not in the service of the defendant at the time he testified, gave it as his opinion that if the car had been going at the rate of ten miles an hour it could have been stopped by using the reverse within five or ten feet, and if going at fifteen or twenty miles an hour, within fifteen or twenty feet. The place of the accident was not a street crossing, it was opposite house No. 3010 Laclede avenue, between Garrison and Cardinal avenues. Garrison avenue is thirtieth street, and Cardinal avenue is thirty-first.

On the part of the defendant the testimony tended to prove as follows:

The car was going east on the south track. It stopped at Cardinal avenue to take on some passengers. The distance from Cardinal to Garrison avenue is about three hundred feet; it was a Sunday evening about 7:30 o'clock. The car was crowded with passengers. After leaving Cardinal avenue the car had gained a speed of eight or ten miles an hour, and when it reached a point about twenty-five feet west of the point on the south sidewalk where the boy was, he ran quickly from the sidewalk, aiming to cross the tracks in a northeasterly course, and when he came to the south track he stumbled and fell; when he fell the car was within eight or ten feet of him. The first time the motorman saw the boy was when the latter ''leaped from the sidewalk.'' (to use the motorman's words) and started running towards the track, when the motorman applied his reverse and sounded his gong, but ''the overhead blew out,'' and then the motorman resorted to the brake and the sand box and did everything he could to stop the car and did stop it in forty or sixty feet, which was the shortest space in which it could have been stopped under the circumstances. Defendant's testimony also tended to show that the quickest method of stopping a car is by use of the reverse; that, however, is attended with danger and when the car is full of passengers it is not resorted to, except to save life, or to avert some serious accident. When the reverse is to be used it must be used quickly, and sometimes when it is applied (to use again the language of the motorman) the overhead blows out and the electric appliance becomes inoperative — useless — and when that happens the motorman must resort to the hand brake.

The motorman gave no explanation of the term ''the overhead blew out'' but as it related to an ap-

204 Sup—33

pliance that was within common knowledge of persons familiar with trolley cars, counsel on both sides seemed to assume that the jury understood it, as doubtless they did. This is what we understand he meant:

In the operation of the trolley car the electric current drawn from the wire on the outside, passes through a device called the "current braker" fixed against the inside of the roof or hood of the car just overhead where the motorman stands; its office is to prevent an excess of the electric current flowing through the motors. An excess of the current causes this device to open, and while open no current can pass through. When it opens there is a flash and a report, and the motive power for the time being is gone. This is what we understand by the motorman's term "the overhead blew out." At all events, according to the motorman's evidence, when that occurred which he described as "the overhead blew out," there was no mechanical power at his command except the hand brake and the sand box.

The controller, by means of which the current of electricity that propels the car is controlled, is operated by the motorman with his left hand, the reverse with his right hand, the hand brake with his right hand, and the sand box with his foot, so that the reverse and the brake could not be applied at the same time, and after the "overhead blew out" the motorman had to begin to apply the hand brake, the first move in which was to take up the slack, and this was done as quickly as possible.

There were some exceptions taken to the ruling of the court concerning certain points of evidence, which will be considered in the course of the opinion.

The plaintiffs asked several instructions which were given, in two of which they set out the issues under which, if the finding was in their favor, they were entitled to recover.

The first of those instructions was to the effect that if the plaintiffs' son was "hit and dragged" by the car and so killed, and if after the motorman, if he had exercised ordinary care, would have seen the boy in a position of danger in front of the car, and if there was then time and space sufficient by the exercise of ordinary care in which to stop the car before it hit the boy, and the motorman failed to do so, the verdict should be for the plaintiffs.

The second instruction was to the effect that if the car was running in excess of ten miles an hour, and that rate of speed was the cause of the death of the child while he was exercising ordinary care, the plaintiffs were entitled to recover.

Another instruction for plaintiffs defined the term "ordinary care," and another related to points not in controversy.

Of the instructions given for defendant those numbered 4, 5, 6, 7 and 9 are complained of.

I.  Instruction 4 is as follows: "With respect to the alleged negligence of defendant in operating its car at a high and excessive rate of speed, you are instructed that under the ordinances of the city of St. Louis, defendant had the right to operate its car at the place mentioned in the testimony at a rate of speed not exceeding ten miles per hour. Before, therefore, you can find against the defendant on account of the excessive speed, you must find either that defendant operated its car in excess of the speed of ten miles an hour, or at such a speed which under the evidence and circumstances given in the testimony, amounted to negligence, and unless you so find, and also further find that such excessive or negligent speed was the cause of the death of plaintiffs' son, then plaintiffs are not entitled to recover on account of such speed."

Plaintiffs interpret this to mean that the jury were instructed that defendant had the absolute right to run

its car then and there at the rate of ten miles an hour regardless of the circumstances. That is a misunderstanding of the instruction. Plaintiffs in their petition had counted on the ordinance and at the trial, to obviate the necessity of introducing the ordinance in evidence, it was admitted by counsel on both sides in open court that the speed limit fixed by the ordinance was ten miles an hour. The plaintiffs having invoked the ordinance as one of the measures of speed to be observed by defendant, the latter had the right, in view of the admission, to have the jury instructed that so far as the ordinance was concerned defendant had the right to run its car at the rate of ten miles an hour. But the instruction did not say that the car could be lawfully run ten miles an hour regardless of the circumstances; its natural meaning was, that if the car was not run in excess of ten miles an hour there was no violation of the ordinance, and it said, if the car was not run in excess of ten miles an hour or at such a speed which under the circumstances shown in the evidence amounted to negligence, the plaintiffs could not recover on the issue as to speed. We find no fault with that instruction.

II. Defendant's instruction 5 is as follows: "With respect to the failure to sound the gong, or to give warning of the car's approach, you are instructed that such warning is not required under all circumstances, and before you can find against defendant on account of failure to sound its gong, you must find that failure to sound its gong under the facts and circumstances in the testimony, would have amounted to negligence, and not then unless you find that failure to so sound its gong was the cause of the death of plaintiffs' son."

The plaintiffs' criticism of that instruction is that it tells the jury that they cannot find for the plaintiffs on the issue as to the sounding of the gong, unless they find that the failure to sound the gong was

the cause of the accident, instead of saying that it caused, or was one of the causes contributing to the accident.

Viewing the instruction as an abstract proposition the criticism is not entirely without merit. Where several acts of negligence are charged, either one of which, it is alleged, caused or contributed to cause the accident, the jury ought not to be instructed that unless they should find one particular act to have been the sole cause of the accident they should disregard it entirely. But the defendant in drawing this instruction followed exactly the charge in the petition where it is said that in consequence of the failure to sound the bell the boy was killed.

There was evidence for plaintiffs tending to prove that the bell (or gong) was not sounded, and there was evidence for the defendant that as soon as the motorman saw the boy leave the sidewalk running towards the track he sounded the gong to give the alarm.

The accident did not occur at a regular crossing where people were to be expected to be found crossing the street, and there is no circumstance shown in evidence which would indicate that it was the duty of the motorman to ring the bell at that point, unless the appearance of the boy on the scene created a condition that made it his duty.

According to the plaintiffs' evidence the boy was running from the sidewalk towards the track; the distance from the curb to the south rail of the track where he stumbled and fell was 10 feet 8 inches. There was nothing to call the motorman's attention to the boy until he left the sidewalk, and all that the motorman could do to avoid the accident had to be done while the boy was running the distance of ten feet eight inches. How fast he was running the evidence does not show, but the motorman's time limit for action was compressed within the period of time that the

boy consumed in running ten feet eight inches. Another fact to be considered in judging the motorman's conduct in the emergency is, that when the boy reached the track he stumbled and fell, and the inference is not unreasonable that, but for the fall, he would have crossed over safely. Whether we take the plaintiffs' testimony that at the moment the boy fell on the track the car was fifty or fifty-five feet distant and coming at the rate of twenty or twenty-five miles an hour, or that of the defendant, that when the boy "leaped from the sidewalk" the car was not more than twenty-five feet distant and going at a rate not more than ten miles an hour, in either emergency the time space for the motorman's action was very brief. If the contention is, that the point in which the motorman failed in his duty, was to use proper exertion to avoid the injury after he saw the child fall on the track, then we cannot well see what good the sounding of the gong would have done in that emergency.

The complaint of this instruction is that it tells the jury that they cannot find for the plaintiffs on account of failure to sound the gong, even if they should find there was such failure, unless that fact caused the death of the plaintiffs' son. The instruction in that form follows the plaintiffs' allegation in the petition where the negligence in that particular is alleged, not as one of the acts that caused or contributed to cause the accident, but as the cause of the catastrophe. This may be a very narrow criticism of the plaintiffs' petition in that particular, but it is exactly the same criticism that the plaintiffs make of this instruction. And the plaintiffs' instructions in submitting the questions of negligence touching the two acts on which they ask a verdict in their favor are precisely in the same form; defendant has in this respect only followed where plaintiffs led.

The plaintiffs' counsel do not seem to have thought

that the failure to sound the gong, if there was such failure, was a fact of any importance in the case, for they did not ask an instruction submitting that question to the jury. The jury are to look to the instructions, not to the pleadings, for the issues. The only issues in reference to defendant's negligence submitted to the jury under plaintiffs' instructions, related to the alleged failure to stop the car in time to avoid the accident, and running in excess of the speed ordinance. There is nothing in instruction 5 of which plaintiffs have any right to complain.

III. Defendant's instruction numbered 6 is as follows: "With respect to the charge of negligence that the defendant's motorman failed to stop its car after plaintiffs' son was in a position of peril, you are instructed that this principle of law does not apply, unless the plaintiffs' said son was in a position of peril a sufficient length of time to have enabled those in charge of defendant's car to stop, or so check the same as to avoid striking and killing plaintiffs' said son, in the exercise of ordinary care on their part, and with the means and instrumentalities at hand for so stopping said car."

The complaint of that instruction is, that it is said that it leaves out of view the duty of the motorman to be on the lookout to discover the peril. That is a misunderstanding of the instruction. The instruction in effect concedes that the motorman saw the danger as soon as it occurred and excuses him only on the ground that he did not have time after it occurred in which to stop the car with the means and instrumentalities at hand. In this respect it is less favorable to the defendant than if it had introduced the question of whether the motorman, by the exercise of ordinary care, could have discovered the danger sooner than he did. There was sufficient evidence to support the instruction.

IV. Defendant's seventh instruction is also criticised. That instruction was to the effect that if the jury find from the evidence that the boy was of sufficient age and intelligence, judging him by the standard of boys of his age, to appreciate the danger and that he went upon the track without looking or listening so close to the car that the motorman by the exercise of ordinary care could not stop in time to avoid hitting him, the defendant was not liable. The criticism is that it does not deal with the question of dragging after hitting the boy, the instruction is otherwise unassailed. The same point is urged against defendant's ninth instruction, which we will presently consider.

V. Defendant's instruction 9 is as follows: "The court instructs the jury that if they find from the evidence that the plaintiffs' son undertook to run across the street in front of defendant's moving car, and while the same was so close to plaintiff as to prevent the motorman in the exercise of ordinary care with the means and appliances at hand, from stopping, or checking his car so as to avoid striking the plaintiffs' said son, whereby plaintiffs' said son was struck and killed, then plaintiffs are not entitled to recover and your verdict must be for the defendant."

Of that instruction it is said that it ignores the liability of defendant for its alleged act of negligence in dragging the child after he was struck.

Whilst the petition charges and the evidence proved that the boy was struck and dragged and thereby received injuries of which he died, yet there was nothing in the evidence that would have justified the submitting of a proposition to the jury that the boy lost his life not in consequence of having been struck by the car but in consequence of having been dragged after he was struck. If the jury had found from the evidence that the boy had fallen upon the track so close to the coming car that the motorman could not

have avoided the collision, yet had rendered a verdict for plaintiffs on the theory that it was the dragging that caused the injury, the verdict would have been based on mere conjecture. If the evidence had raised such a question this instruction did not eliminate it from the case but only omitted to submit it; the instruction dealt only with the charge that the defendant failed to stop its car in time to avoid striking the boy and told the jury that if the plaintiffs' son was struck and killed under the conditions in the instruction mentioned the defendant was not liable.

And in this respect also the defendant followed the theory contained in the plaintiffs' instructions. The plaintiffs asked no instruction presenting the question that they now say this instruction ought to have presented.

It is said that this instruction is also faulty because it leaves out of view the question of excessive or dangerous speed. In other words, the contention is, that although the boy may have come on the track so close to the approaching car that it was impossible for the motorman to stop it in time to avoid the accident, yet if that impossibility was caused by the excessive speed of the car the defendant is liable. We need not discuss that proposition because there was no such theory advanced by the plaintiffs in the circuit court, either in their pleadings or instructions. True it is, the petition alleges that the car was being run at a dangerous speed, and in excess of the limit prescribed by the ordinance, and that such speed contributed to cause the accident, but it is also true that the plaintiffs allege in their petition, in the fifth specification of negligence, that the motorman was negligent in failing to use ordinary care to stop the car after he discovered the boy in danger at a sufficient distance to have permitted the car to be stopped before hitting him. And that was the theory on which the plaintiffs asked

a verdict in their favor; they said in their first instruction if the jury believe from the evidence that plaintiffs' son was killed in consequence of being hit and dragged by the car and "was so killed by reason of the failure of said agent of defendant to use ordinary care to stop said car after said agent by exercising ordinary care could have discovered that said boy was in a position of danger in front of said car, and was in a place where he would be hit by said car as it moved eastward; and if your further believe from the evidence that after said agent of defendant could have so discovered said boy, in a position of danger as aforesaid, there was time and space sufficient to permit said car to be stopped by said agent of defendant before hitting said boy, had said agent exercised ordinary care to stop said car and that nevertheless said agent failed to exercise such care," etc., then the defendant was liable. Now the defendant's instruction follows the same theory and tells the jury that, if the boy came on the track so close to the car that the motorman could not stop it in time to avoid the collision, defendant was not liable. Defendant's instruction only accepted the issue which plaintiffs tendered in their instruction. There was no error in that instruction.

VI. One of the plaintiffs' eye-witnesses to the accident, a young lady, narrating what she saw, said: "He stumbled there—." Counsel for defendant objected that the witness was stating a conclusion, the court sustained the objection and the plaintiffs excepted. This is assigned for error. As it appears literally on the face of the record (and the stenographer has doubtless recorded it just as it occurred) the objection follows the words, "He stumbled there," but reading what immediately precedes those words we see that the objection related to the preceding statement and not to those words. Taking the witness's

statement on that point in full this is what she said: "He (meaning the child) went direct through Gordon's east gate and started across the street, and just as he got inside the eastbound track he stumbled; evidently as I found later there was a hole where the bricks had been sunken was what caused the child's fall. He stumbled there— Mr. Hocker: I object to that as a conclusion. The Court: Objection sustained." Thus we see that although the objection came after the witness had started another sentence yet it was aimed at what she had said in the sentence which she had just ended, interrupting the one she was just beginning. What the witness said as to the cause of the boy's falling was her conclusion, and that is what the objection referred to. The same witness had just before said that the boy stumbled and she said it two or three times afterwards and no objection was made. The motorman, a witness for defendant, also said that the boy stumbled and fell on the track. There was no error in that ruling.

VII. This same witness, who was standing on the steps in front of the house in which she lived, which was on the south side of the street, testified that the motorman was not looking towards the boy but his face was turned towards the north, "There were persons on the platform and he evidently was talking to someone on the platform." Defendant's counsel objected to that statement as a conclusion and the court sustained the objection. That is assigned for error. We see no fault in that ruling.

VIII. The motorman was a witness for defendant and gave his account of the accident. On cross-examination he was asked if he had testified at the coroner's inquest and he answered, "No." "Were you present at the inquest? A. Yes." The counsel for plaintiffs then produced and showed to the court what pur-

ported to be a transcript of the evidence taken at the coroner's inquest in which it appeared that this motorman was sworn as a witness and had in answer to questions stated his name, residence and business; he was then asked to state all about running over this boy, whereupon he said: "I don't care to testify; I might incriminate myself." The court on objection of defendant ruled that that statement should not go to the jury. That is assigned for error.

The court's ruling on that point was correct. The statement of the witness that he had not testified at the coroner's inquest was substantially true and as the witness evidently understood it it was entirely true. Plaintiffs were not entitled to have the jury in this case draw an inference to the prejudice of the defendant from the fact that the motorman through caution, or timidity for his own sake, would decline to testify before the coroner. He had just gone through the distressing experience of having killed a child, and though he may have been entirely conscious of having done everything in his power to prevent it, yet the distressing fact remained; the law did not compel him to speak, and he declined to do so, but that was his personal affair, with which the defendant had nothing to do.

The contention of plaintiffs is that the evidence was competent as tending to impeach the witness; the inference they would draw is that if he had not been afraid of incriminating himself he would have told a different story at the coroner's inquest from that which he told at this trial, and the fact that he declined for that reason to testify puts him under the suspicion of carrying a guilty conscience and authorizes the jury to discredit his testimony. The right of the motorman to refuse to testify under the circumstances stated was a personal right of such high importance that it is expressly guarded in the Constitution itself. It is

there given absolutely and unequivocally, yet we are now asked to declare that it is a right which the citizen will exercise at his peril, the peril of being branded with suspicion, the peril of having it brought up against him to impeach himself if he should ever assert his innocence. Such a ruling would be a gross impairment of the constitutional right; because it would burden it with a dangerous consequence. Not only is this right given in the Constitution but the General Assembly in dealing with another feature of the same subject has shown its high appreciation of it. In section 2637, Revised Statutes 1899, the right of an accused person to testify in his own behalf is given, but to guard the person from suspicion for failing to avail himself of that right that section is immediately followed by one which expressly forbids an invidious inference to be drawn from that fact, and forbids any reference to it being made by court or counsel. The courts have no right to brand as criminal or suspicious an act which the law unconditionally and unequivocally authorized to be done.

In the brief of counsel for plaintiffs several authorities are cited as supporting their contention, but as we understand those cases there is only one that sustains the position, that is, Commonwealth v. Smith, 163 Mass. 411. In that case the defendant, an alderman, was indicted for engaging in a conspiracy to solicit bribes in connection with his official duties. On the trial the defendant was a witness in his own behalf and testified in effect that he was innocent of the charge; on cross-examination, over his objection, the trial court required him to answer whether he did not refuse to testify before the grand jury on the ground that he might incriminate himself. The Supreme Court of Massachusetts held that that was not error. But in discussing the subject that court pointed out a peculiarity of the law of that State which is quite different

from the law of Missouri. The court said: "In this Commonwealth, the cross-examination [of a defendant] is not restricted to matters inquired of in chief. He may be cross-examined like other witnesses. He may be questioned as to all incriminating circumstances, and he must answer all such questions as are relevant to the subject of the charge against him. Whatever he has said or done, or omitted to say or do, which is relevant, may be inquired into." Even if our law did not, as it does, limit the cross-examination of a defendant in a criminal case to the matters in relation to which he had testified in chief, we would not say that a man who had only availed himself of a high personal privilege which the Constitution had given him was for that reason to be stigmatized with suspicion of guilt or have it brought up to discredit him as a witness when he avails himself of the right given him by law to testify in his own behalf. We must not interpret this provision of our Constitution as if it was designed to protect the guilty nor should we presume that one who avails himself of it is hiding his guilt. The object of the law is to protect the innocent and the law still covers the man with the presumption of innocence even when he refuses to give testimony that might be turned against himself.

The trial court committed no error when it refused to allow this evidence to go to the jury to impeach the motorman as a witness.

We find no error in the record. The judgment is affirmed.

All concur, except Judge WOODSON dissents from paragraph VIII.

## IN BANC.

PER CURIAM: The foregoing opinion delivered in Division No. one, with paragraph VIII re-written,

is adopted as the opinion of the Court in Banc. All concur, except *Woodson, J.*, who concurs in all except paragraph VIII, as to which he dissents.