358 P.2d 155

A. P. (Jack) BUZARD, Appellant,

v.

William Ralph GRIFFIN and John Joseph Hourihan, individually and in the right and on behalf of the electors and members of the Democratic Party of the State of Arizona and in the right and on behalf of the citizens and the electors of the State of Arizona, Appellees.

No. 7055.

Supreme Court of Arizona.

Dec. 21, 1960.
Rehearing Denied Feb. 7, 1961.

Lewis, Roca, Scoville, Beauchamp &
Linton and John P. Frank, Phoenix, and

Chandler, Tullar, Udall & Richmond, Tucson, for appellant.

John E. Madden, Phoenix, for appellees.

STRUCKMEYER, Chief Justice.

This case arises out of the primary election of September 9, 1958. Three candidates, William T. (Bill) Brooks, the incumbent, William A. (Bill) Brooks and A. P. (Jack) Buzard, there sought the Democratic nomination for a six-year term on the Arizona Corporation Commission. As a result of the election, A. P. (Jack) Buzard received 56,799 votes, William T. Brooks 48,988 and William A. Brooks 26,-547. Accordingly, Mr. Buzard was declared the Democratic nominee for the office and was issued a certificate of nomination.

On October 20, 1958 a statement of election contest was filed by appellees, "individually, and in the right and on behalf of the electors and members of the Democratic Party of the State of Arizona." Appellant A. P. Buzard moved to dismiss and the Superior Court of Maricopa County granted the motion, entering a judgment dismissing the election contest. Appellees appealed and this court reversed, holding that the complaint stated a valid election contest, Griffin v. Buzard, 1959, 86 Ariz. 166, 342 P.2d 201. Although this is not a criminal action, certain of the allegations in the statement of election contest charge appellant with violations of A.R.S. § 16-1303 and A.R.S. § 16-1307 dealing respectively with coercion and intimidation of an elector and changing the vote of an elector by corrupt means or inducement.

Thereafter the cause proceeded to trial with the result that the Superior Court of Maricopa County annulled and set aside the nomination of A. P. Buzard as Corporation Commissioner based on the following express findings:

"that W. A. Brooks did not intend to be a good faith candidate for the office of Corporation Commissioner, but that his name was placed on the ballot through the efforts of himself *and A. P. (Jack) Buzard* and associates to confuse Brooks' (sic) name with that of W. T. Brooks, a good faith candidate, who was running for re-election, and thereby draw mistaken votes to W. A. Brooks." (Emphasis supplied.)
*"that the Contestee, A. P. (Jack) Buzard committed an offense against the elective franchise* of the voters at the primary election of September 9, 1958, by fraudulent device or contrivance, and in defrauding the electors at said primary election by deceiving (sic) and causing them to vote for a different person for the office of Arizona Corporation Commissioner

than they intended or desired to vote for." (Emphasis supplied.)

Essentially the complaint charges that William A. Brooks was not a candidate in good faith; that the bad faith consisted of placing his name on the ballot for the purpose of misleading the voters and thereby drawing votes from William T. Brooks. It is also alleged that Buzard was implicated in such conduct, *directly or through agents*, by originating, aiding and abetting or taking part in that conduct. Assuming without deciding that W. A. Brooks was not a good faith candidate, the crucial question then is whether there is sufficient evidence to implicate Jack Buzard in conformity with the allegations of the complaint and the findings of the court below.

The court below relied on these facts as evidencing Buzard's participation in the procurement of W. A. Brooks' candidacy:

1. Proof that some of the nomination petitions of W. A. Brooks and Buzard were circulated by the same persons;

2. Proof that a Buzard supporter (who was also a supporter of W. A. Brooks) was a friend of the daughter of W. A. Brooks and visited the home of W. A. Brooks on two occasions during the campaign;

3. Proof that certain people who were subpoened for the purpose of giving depositions at appellees' request, after the primary election and after the contest was started, met in a hotel room the evening before they were to appear, and that they all declined to testify on the following day;

4. Proof that at the time regularly set for taking the depositions of A. P. Buzard, he refused to answer certain questions by invoking the constitutional privilege against self-incrimination.

No other evidence whatsoever is claimed to establish Buzard's connection with the entrance of W. A. Brooks in the race for Corporation Commissioner. Is this evidence sufficient to implicate A. P. Buzard as originating, aiding or abetting in the candidacy of W. A. Brooks? We think not.

*Points 1 and 2.* The evidence established that a person by the name of Harold Brasfield, an employee of the Arizona Corporation Commission and a friend of Pearl Brooks DiFebbo, the daughter of W. A. Brooks, visited the W. A. Brooks home on at least two occasions during the campaign and circulated two nomination petitions on his behalf, obtaining 50 signatures thereon; that he delivered nomination petitions of W. A. Brooks to a Patricia Brown and paid for her circulating 28 of them; that he had Georgia C. Watts and her husband, Bennie Watts, circulate and fill in 12 petitions for W. A. Brooks; that he also circulated five petitions on behalf of the candidacy of A. P. Buzard, and obtained 100 names on them; that he worked in the Tucson of-

fice of the Corporation Commission and knew Millard C. Hardin, who acted as financial agent and filed a primary expense statement on behalf of W. A. Brooks. Hardin circulated one petition with 25 names on behalf of W. A. Brooks and five petitions containing 118 names on behalf of A. P. Buzard.

It would appear therefore that both Brasfield and Hardin took a leading part in the candidacy of W. A. Brooks and were also interested in and took part in the candidacy of A. P. Buzard. There is, however, no testimony or evidence that Brasfield or Hardin engaged in their activities on behalf of W. A. Brooks at the instigation or suggestion of A. P. Buzard.

There is evidence that E. T. Williams, a Corporation Commissioner, asked one Pete Waggner, an employee of the Corporation Commission at Tucson, to campaign for A. P. Buzard and that Pete Waggner knew Harold Brasfield and was in contact with him since both worked in the same office in Tucson. This latter evidence falls far short of establishing a connection between A. P. Buzard and the efforts of Brasfield and Hardin to promote the candidacy of W. A. Brooks. If there is an inference from Waggner's knowing Brasfield, it can do no more than support the speculation that E. T. Williams was able to exert sufficient influence to induce Brasfield and Hardin to assist in the candidacy of Jack Buzard.

*Point 3.* · The court below in part based its judgment on the refusal of certain witnesses to answer any questions concerning ing the campaign of W. A. Brooks. Its conclusion was predicated on the fact that after the statement of election contest was filed on October 20, 1958, subpoenas were issued for the purpose of taking depositions of certain witnesses on October 23, 1958. On the evening of October 22, two lawyers, one being the attorney for A. P. Buzard, met in a hotel room in Tucson with, among others, A. P. Buzard, Harold Brasfield, W. A. Brooks, Mrs. W. A. Brooks, Pearl DiFebbo, Millard C. Hardin and Pete Waggner. The following day at the time duly set for the taking of their depositions, these individuals (except A. P. Buzard) refused to answer any questions. The court below inferred from the refusal of the people present at the meeting in the hotel room that there was a plan by A. P. Buzard to prevent the witnesses from giving any testimony. From this inference it derived a second inference that had their testimony been given, it would have been adverse to A. P. Buzard.

We think such a conclusion, basing an inference on an inference, as it does, spins out the chain of reasoning into the region of barest conjecture. Wholly aside from the rule of law that no inference prejudicial to either party can legitimately be drawn from a witness' assertion of his privilege of refusing to testify, Common-

wealth v. Ries, 337 Mass. 565, 150 N.E.2d 527, 541; Billeci v. United States, 87 U.S. App.D.C. 274, 184 F.2d 394, 24 A.L.R.2d 881, it has long been the rule in Arizona that in order to draw an inference from an inference, the prior inference must be established to the exclusion of any other reasonable theory rather than by a probability. New York Life Insurance Co. v. McNeely, 52 Ariz. 181, 196, 79 P.2d 948.

In the instant case the court below drew the inference that there was a plan by A. P. Buzard to prevent the witnesses from giving any testimony. This inference was derived, as stated, from a meeting of the witnesses in a hotel room and their refusal to testify the following day. It will be noticed that there must be inferred, first a plan, second that it was A. P. Buzard's plan and third that the plan was to prevent the witnesses from giving testimony. While it is of course conceivably possible to draw such an inference, it is also probable to conclude that the meeting in the hotel with the lawyers was to ascertain the legal rights of those persons present. Hence there is no inference to the exclusion of any other reasonable probability that there was here a plan to prevent the witnesses from testifying.

Even if it were possible to conclude, to the exclusion of any other reasonable theory, that there was a concerted plan not to testify, is it a necessary conclusion that it was A. P. Buzard's plan to prevent these witnesses from giving any testimony. Each may have decided independent of the others on the advice of the counsel present what his course of conduct would be. In this respect the record shows that W. A. Brooks, Mrs. W. A. Brooks, Pearl DiFebbo and Millard C. Hardin all refused to testify the following day on specific instruction from their attorney, Ira Schneier, there present. It further shows that Harold Brasfield stated:

"Last night I heard Mr. Schneier advise his clients to * * *. I heard him read the complaint to them and I heard him advise his clients, he felt the court lacked jurisdiction in this matter, and I personally believe my constitutional rights to refuse to answer any further questions, on the ground it would be invading into my political beliefs and activities, and until I can get advice from counsel, I refuse to answer any further questions."

We think it is clear that the record does not support the inference to the exclusion of any other reasonable theory that there was a *plan by A. P. Buzard* to prevent these witnesses from giving any testimony merely because of the presence of A. P. Buzard and his lawyer at the conference. Accordingly the inference that their testimony would be adverse to A. P. Buzard is

a mere possibility and no legitimate conclusion can be based thereon.

*Point 4.* The court below rested its judgment in part on an inference drawn from the refusal of A. P. Buzard to answer certain questions at the time duly set for the taking of his deposition on December 12, 1959. At that time he invoked the constitutional privilege against self-incrimination, while at the same time specifically reserving the right to testify at the actual trial of the cause. The trial court stated:

" * * * the action of A. P. Buzard in preventing these witnesses to testify, and Mr. Buzard's refusal to answer questions * * * at the taking of his deposition * * * raise the inference that his and their testimony, if given, would have been unfavorable to said A. P. Buzard."

It is first argued by appellant that it is improper in a civil case to draw an inference from the invocation of the privilege against self-incrimination. We think, however, that the majority of courts while recognizing the distinction between criminal and civil proceedings permit an inference to be drawn in civil litigation as to the truth of the misconduct with which the litigant is charged. Fross v. Wotton, 3 Cal.2d 384, 44 P.2d 350; Amana Society v. Selzer, 250 Iowa 380, 94 N.W.2d 337; Ikeda v. Curtis, 43 Wash.2d 449, 261 P.2d 684.

" * * * while his claim of privilege may not be used against him in a subsequent criminal prosecution, an inference that his testimony would have been unfavorable to him is available to the opponent in the civil cause." 8 Wigmore Evidence, 3d ed. Pocket Supplement, Section 2272.

The further question remains to be answered as to whether under the peculiar circumstances of this case an inference can be drawn against A. P. Buzard that he procured and aided or assisted in the candidacy of W. A. Brooks. At the trial of the cause, appellant took the witness stand and thereafter answered all questions propounded to him. When counsel for appellant concluded, appellees dismissed the witness without cross-examination. The issue is whether an inference which could have been drawn from the claiming of the privilege at the time of taking the deposition continues after the witness, waiving his former claim of privilege, subsequently testifies in the same proceeding.

An inference is a fact which may be presumed from the proof of the existence or non-existence of other facts. It is a conclusion from a proven fact or facts. Here the fact to support the inference was the failure of A. P. Buzard to testify at his deposition. When he did later testify at the trial, the fact upon which the inference rested no longer existed and the

inference deducible from it vanished and was extinguished. The controlling fact here to be emphasized is that appellant did testify at the trial of the cause. It is this fact which destroys the inference arising from prior failure to testify.

Moreover, the testimony of A. P. Buzard was an unequivocal denial of the allegations of the complaint. He testified:

"Q. Mr. Buzard, did you or any person that you authorized or knew of, have anything to do with the entry of Mr. W. A. Brooks of Tucson, Arizona, into the race, Corporation Commissioner, for the long term during the last election? A. * * * No sir.

"Q. After Mr. W. A. (Bill) Brooks announced his candidacy for the Corporation Commissioner, did you personally aid or assist him in his candidacy in any way? A. No sir.

"Q. After Mr. W. A. (Bill) Brooks of Tucson entered the race, did you authorize and instruct any person whomsoever to aid or assist his candidacy in any way? A. No sir."

In this jurisdiction the triers of fact may not arbitrarily reject evidence where there is nothing intrinsic in the evidence itself or extrinsic in circumstances which cast suspicion upon the testimony. Ratley v. Industrial Commission, 74 Ariz. 347, 248 P.2d 997; In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815. The trial judge was not at liberty to reject the uncontradicted positive testimony of A. P. Buzard.

Seemingly only one other state has passed on the issue here directly presented. Its holding is in conformity with our conclusion here.

"This court is committed to the doctrine that a witness who appears and testifies generally at a trial on the merits may not be discredited by showing that at a former hearing or in a priorly given deposition such witness refused to testify on the ground his testimony might tend to incriminate him. Masterson v. St. Louis Transit Co., 204 Mo. 507, 523–525, 98 S.W. 504, 103 S.W. 48, 53–54; Garrett v. St. Louis Transit Co., 219 Mo. 65, 87–95, 118 S.W. 68, 74–78; State v. Weber, 272 Mo. 475, 199 S.W. 147, 148; Hill v. Missouri Packing Co., Mo.App., 24 S.W.2d 196, 198; State v. Conway, 348 Mo. 580, 154 S.W.2d 128, 134." Franklin v. Franklin, 365 Mo. 442, 283 S.W. 2d 483, 485.

Appellees urge that because of the claim of privilege against self-incrimination, they have been deprived of the benefits of pretrial discovery. We think the public policy of this state encourages litigants and others to fully testify as to all material matters in order that the truth may prevail. Were this court to adopt a rule per-

mitting the inference to prevail over the subsequent unimpeached sworn declarations, it would discourage such subsequent testimony. It was the appellees' right to request the court below for a continuance in order to refute A. P. Buzard's sworn testimony, if such were possible.

■■ The instant case is one where appellees have alleged fraud. Fraud must be established by clear and convincing evidence. It may not be predicated on speculation and conjecture. Murillo v. Hernandez, 79 Ariz. 1, 281 P.2d 786; Stewart v. Schnepf, 62 Ariz. 440, 158 P.2d 529. The judgment of the court below palpably rests upon speculation and conjecture. It finds no reasonable support in the evidence. It must be set aside.

■ One further point should be considered. After A. P. Buzard refused to testify at his deposition, appellees moved the court below for an order compelling A. P. Buzard to answer the questions so propounded. This motion was denied. Thereafter, appellees moved to strike the answer of A. P. Buzard upon the grounds that appellant had refused to answer questions on oral deposition. This motion was also denied. It is now urged in support of the judgment that appellees' motion to strike should have been granted and judgment should then have been rendered against A. P. Buzard. Appellees are plainly in error. Rule 37(a), Rules of Civil Procedure, 16 A.R.S., specifically provides the procedure when a party or a witness refuses to answer any question propounded upon oral examination, the opposing party may apply to the court for an order compelling an answer. It then becomes the duty of the court to determine whether the refusal was without substantial justification. By rule 37(b), if a party refuses to answer a question after being directed to do so by the court, the court may enter an order striking out pleadings.

Such is not the case here. On appellees' motion to compel A. P. Buzard to answer, the court recognized his constitutional right to refuse to testify and denied the motion. There was consequently no refusal to comply with the court's order to answer, as is required by rule 37(b). Since appellees' motion to strike appellant's pleadings was not authorized under the rule, the court below did not err in refusing to render judgment in appellees' favor.

Since there is no reasonable testimony or evidence to support the judgment, it is ordered reversed with instructions to enter judgment declaring A. P. (Jack) Buzard as nominated Corporation Commissioner for the long term at the primary election of 1958 and elected to the office in the general election in 1958.

BERNSTEIN, UDALL, and LESHER, JJ., concurring.

PHELPS, Justice (dissenting).

I regret that it again becomes my duty to dissent to the majority opinion. This is especially true in the instant case for the reason that I have known appellant favorably over a period of many years. This fact has made it more difficult for me to translate my convictions in this matter into words.

I find no particular fault with the statement of facts in the majority opinion as delineated therein in discussing points 1, 2, 3 and 4 upon which they say the trial court relied in reaching its judgment. But I do find fault with the mental processes employed by the majority in arriving at their conclusion that the facts and circumstances in this case as clearly shown by the evidence, lead only to conjecture and speculation.

They say that the trial judge in arriving at his judgment was compelled to base inference upon inference which led inevitably into the field of speculation. We said in New York Life Ins. Co. v. McNeely, 52 Ariz. 181, 196, 79 P.2d 948, 955, that an inference may not be predicated upon another inference unless the preceding inference has been established "to the exclusion of any other reasonable theory". The Court recognized the fact that some of the most distinguished textbook writers on the rules of evidence contend that this is done in actual practice and that justice could not be attained in the trial of cases if this were not true. It quoted the following from 1 Wigmore on Evidence (3rd Edition) section 41:

"* * * There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it; and from this we infer that it was his bullet which struck and killed the deceased. Or, the defendant is shown to have been sharpening a knife; from this we argue that he had a design to use it upon the deceased; and from this we argue that the fatal stab was the result of this design. In these and innumberable daily instances we build up inference upon inference, and yet no Court ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data."

Udall on Evidence at page 208, section 111, states that:

"* * * The courts have often mouthed the formula, that an inference may not be based on another inference. This statement is contrary to common sense, and is rejected by the Arizona decisions."

A careful study of all of the facts and circumstances gleaned from the evidence in this case convinces me beyond all reasonable doubt that W. A. (Bill) Brooks of Tucson was a *mala fides* candidate in entering the race for the long term Corporation Commissioner's position, contest for which was then being waged before the people between appellant and William T. (Bill) Brooks. As found by the Court, in effect, W. A. (Bill) Brooks was a political unknown. He had never run for a political office before. He had no previous experience or background that would qualify him in any degree for Corporation Commissioner or any other office of responsibility so far as the evidence disclosed. He was born in Arkansas and had farmed there all of his life until around 1939 or 1940 when he went to California. He lived there for a few months then came to Arizona where his family joined him and where he procured a job with Kleiser Sign Company and then a few months later went to work for Pacific Fruit Express. This company furnishes refrigerator cars to the Southern Pacific Railroad upon order. The cars were repaired in Tucson. Mr. Brooks, in 1958, had been working for P. F. E. nearly 18 years in October 1958 and was at that time a truck driver.

An attempt was made on October 23, 1958 to take Brooks' deposition in Tucson. He refused to answer any questions touching upon his candidacy for Corporation Commissioner. This was done upon advice of counsel. Again on November 25, 1959, he refused to answer any question relating to such candidacy or any questions at all upon the ground that it would tend to degrade and incriminate him, and invoked the protection of Art. 2, Section 10 of the Arizona Constitution, A.R.S., and the Fifth and Fourteenth Amendments to the Constitution of the United States. The majority opinion concede that in a civil action that the above action of Brooks under the law permits the inference to be drawn that the misconduct with which he is charged is true (citing cases). With this I agree.

The evidence discloses that Brooks only made one speech during the campaign and that was made at the park in Tucson on Labor Day. According to the testimony of his daughter, he did not spend *one dime* of his own money on the campaign because he did not have it to spend. She further testified that during the campaign he was at home in the evenings as usual except when he and her mother would be out for a little while on Saturday or Sunday evenings; that between the time he entered the race which, as best I could determine, was sometime in June and the Primary election he and her mother were away for two weeks on a vacation—where, I do not know. She knew nothing of his intention to run for office until his petitions were out which appears to have been in June. Mr. Buzard's petitions bore signatures as early as around

the first of April and I believe it to be the custom of all candidates to begin to circulate their petitions as early as they can conveniently do so.

The above facts and circumstances (with exception of invoking the constitutional provision protecting one from giving evidence of an incriminating character against himself) would not if standing alone be sufficient to establish the *mala fides* of his candidacy but when all are considered together they speak more eloquently than words in establishing that fact. They compel the conclusion that his candidacy was not in good faith and that he had no intent, desire or hope of winning. The evidence discloses he was totally unqualified to discharge the duties of the office he purportedly sought.

Why then did he enter the race? The inference is inescapable that someone persuaded him to do it. What would be the purpose or motive for having him enter this particular race? Again, but one inference can be drawn and that is that his name was Brooks—William Alford Brooks—it was a natural for the job to be done. His name could appear on the ballot with but slight variation as William A. (Bill) Brooks. William and Bill are the same. It mattered not that back in Arkansas he had been known by the name of "Al" or "Sally" —an early childhood nickname. He was called "Alford" always by his wife, and a next-door neighbor in Tucson called him "Bill". This is according to the testimony of his daughter, Mrs. Pearl Di Febbe, who was the only member of the family from whom any information could be extracted.

The sole question for the determination of this Court in this case therefore is, who was instrumental in the procurement of the entry of W. A. (Bill) Brooks into the race here involved? It cannot be logically argued that his entry under a name almost identical with the incumbent William T. (Bill) Brooks (already in the race opposing appellant who sought to displace him) was accidental or incidental. Nor could it be logically argued that the two names so nearly identical running for the same office would not tend to confuse the voters at the polls. And I believe the inference is perfectly clear in the light of the *mala fides* of W. A. (Bill) Brooks entering the race, that those who were instrumental in devising the plan or conspiracy designed it and carried it into execution for the sole purpose of deceiving and confusing the voters of this State. The fact is significant that W. A. (Bill) Brooks made no campaign. That, no doubt, was as it was planned. I dare say many people did not even know he was in the race until they went to the polls, and people who knew William T. (Bill) Brooks only by reputation by reason of his long service as a public officer or who were but slightly acquainted with him did not know which one was the incumbent and which was not. The

setup of the name as William A. (Bill) Brooks made the confusion more confused. He was not addressed by anyone as "Bill" except by his next-door neighbor.

Who would profit most by creating this confusion? Naturally appellant would because it would necessarily split the opposition vote between his two opponents, William A. (Bill) Brooks and William T. (Bill) Brooks. This fact alone would supply a motive for the action. But this alone falls far short of the proof necessary to place the fraud and deception, implicit in the act, at the door of appellant. The presence of motive is not necessary to a conviction even in a criminal case nor is its presence a bar to acquittal. It is however a factor for consideration as a part of the whole.

I am convinced however that when all the facts and circumstances of this case are tied together they present an irrefutable conclusion that the findings and judgment of the trial court are amply sustained by the evidence and its judgment should be affirmed. The facts here strongly bring to mind a story I read as a child in one of the McGuffy's Readers of a father who called his seven sons together and handed each small twigs of similar size and told them to break them, which they easily did. Then he asked them to return them to him and he bound them tightly together and handed them back and asked them to break them, and not even the strongest among them could break or even bend them. The moral of the story, of course, was that "in unity there is strength." If the strength of unity of purpose is used for an immoral or unlawful achievement it becomes a danger to society.

Let us look at the remaining facts and circumstances of this case and tie them together with appellant's own conduct. The majority opinion declined to decide the question of whether William A. (Bill) Brooks was a good faith candidate. I think I have shown above that he was not. It is my view that the fact that he was a *mala fides* candidate is an essential factor in determining the primary issues of this case, that is, whether appellant was instrumental in the violation of our law designed to preserve the purity of elections in Arizona.

It is a most significant fact that Harold Brassfield, an employee of the Corporation Commission, circulated or had circulated and paid for over 80 petitions containing space for over 2,000 names, and Millard C. Hardin, also an employee of the Corporation Commission, reported to the Secretary of State campaign election expenses of William A. (Bill) Brooks, in the sum of around $600. Although W. A. Brooks was running against William T. (Bill) Brooks, then a member of the Commission and appellant, the latter was seeking to displace William T. (Bill) Brooks. Neither Brassfield nor Hardin intended, desired nor had the slightest hope that William A. (Bill) Brooks could or would be elected. The amount of his campaign expenses clearly indicated the

inevitable result as well as their intent. The plain inference is that they were working for appellant, and against William T. (Bill) Brooks, then a member of the Commission. That fact was clearly established. This could not have been without the knowledge and the consent of the appellant. Eddie T. Williams, also a member of the Commission, was actively supporting appellant. Eddie had instructed Pete Waggoner, another employee of the Commission, to support appellant. Pete Waggoner was in close contact with both Brassfield and Hardin during the campaign and could not have failed to know of their activities in behalf of W. A. Brooks' candidacy. It follows that Eddie T. Williams must have been informed by Waggoner of the apparent disloyalty of Brassfield and Hardin. The record discloses no action of reprisal therefor. The inference is therefore that he approved their action. The above circumstances are only important in that they tend to show that Williams and these employees were opposed to the re-election of William T. (Bill) Brooks and favored the election of appellant.

What I shall next relate, in my opinion, indisputably ties appellant into the plan, agreement or conspiracy, or whatever you want to call it, to bring William A. (Bill) Brooks into the race involved here for the purpose of splitting the opposition vote to appellant, calculated to result in appellant's election.

Counsel for appellee almost immediately after filing his statement of election contest had subpoenas duces tecum issue to take the deposition of witnesses in Tucson on October 23, 1958, ordering them to produce certain letters, documents, etc., touching upon the entry of W. A. Brooks into the long term corporation commissioner race. These witnesses included William A. (Bill) Brooks, his wife, and daughter Mrs. Pearl Di Febbe, Harold Brassfield, Millard C. Hardin and Pete Waggoner.

All of the above-named witnesses appeared in the lobby of the Pioneer Hotel at around 10:30 p. m. on the evening of October 22. They later retired to the room of the attorney for the appellant and (Duke) Senner, another member of the Corporation Commission running for the unexpired term of his deceased predecessor. Appellant was also present at that meeting as was Ira Schneier, attorney representing the Brooks, Brassfield and Hardin and perhaps others. With the exception of Mr. Senner they all remained in the room for one to two hours.

The next morning when they appeared at the time and place designated for taking their depositions all of the above-named witnesses, except appellant who was not called, refused to answer any questions concerning the entry of William A. (Bill) Brooks into said race for Corporation Commissioner. As stated by the Court in its finding of facts this concerted action

on the part of such witnesses attempted to be interrogated by counsel for appellees, indicated that such a plan was agreed upon in the upper room the previous night. No other logical inference can be drawn from the facts. Appellant was present at the meeting the night before. He therefore knew what was agreed upon and in the absence of a repudiation thereof must be deemed to have agreed thereto. The author of the majority opinion states that other inferences could have been drawn from these facts. For example, he said they may have been merely following the advice of counsel. Nevertheless, they agreed to not testify whether from advice of counsel or otherwise and they carried out that agreement to the letter on the morning of October 23.

Again on November 17, 1959, William A. (Bill) Brooks refused to testify under oath concerning the matter as above stated upon the ground that it would incriminate him. His wife refused to testify without his consent and he refused to give it. Brassfield refused to testify on the ground that his testimony would incriminate him, and Hardin refused to appear in response to a subpoena and was held in contempt of court for his non-appearance. Eddie T. Williams, Commissioner, on the second day of February 1960 invoked the protection of Art. 2, section 10 of the Arizona Constitution and the Fourteenth Amendment to the Federal Constitution upon the ground that his testimony would tend to incriminate him.

A. P. (Jack) Buzard appellant and who was present at the meeting in a Pioneer Hotel room on October 22, 1958, was subpoenaed to appear on December 12, 1959, for the purpose of taking his deposition (and "there is the rub" from his standpoint). He refused to testify concerning the matters above-mentioned upon the ground that it would tend to incriminate him and invoked the protection of the provisions of the Arizona Constitution and of the Federal Constitution. He later, at the trial of said cause, took the witness stand and answered in the negative three questions as follows:

"Q. Mr. Buzard, did you or any person that you authorized or know of have anything to do with the entry of Mr. W. A. Brooks of Tucson, Arizona, into the race for corporation commissioner for the long term during the last election?

"Q. After W. A. (Bill) Brooks announced his candidacy for the Corporation Commission did you personally aid or assist him in his candidacy in any way?

\*  \*  \*  \*  \*  \*

"Q. After Mr. W. A. (Bill) Brooks of Tucson entered the race did you authorize and instruct any person

whomsoever to aid or assist his candidacy in any way?"

The majority assert that the fact that appellant took the witness stand at the trial and testified, as above pointed out, no inference whatever can be drawn from his earlier refusal to testify upon the ground that it might tend to incriminate him. Citing cases. All of which were from Missouri and of them one was a criminal case to which a different rule applies than in civil cases.

The majority further say this Court is committed to the rule that a trial court may not arbitrarily reject such testimony where there is nothing intrinsic in the evidence itself or extrinsic in the circumstances which cast suspicion upon the testimony. Therefore, the trial court was not at liberty to reject the uncontradicted testimony of appellant. (Citing cases.)

As will be hereinafter pointed out there was intrinsic in the evidence itself, an irreconcilable contradiction which, if one was true the other had to be false. There is also extrinsic in the circumstances and facts which point unerringly, in my view, to the fact that the testimony given at the trial was untrue. Therefore, the cases cited have no application here.

In the first place, with respect to the claim that appellant having taken the stand and testifying at the trial erased the inference of truth of the charge against him.

It will be observed, as above stated, that the denial of any wrong whatsoever by appellant at the trial is in deadly conflict with the reason he gave for refusing to answer any questions when his deposition was sought to be taken. He stated there that his answers would tend to incriminate him. The questions on both occasions were of identical import. He was under oath on both occasions. To say that one or the other of these answers were untrue is a most generous characterization of the term.

If he actually believed that his answers covering exactly the same subject matter as that at the trial would tend to incriminate him, as he then testified, his answers to the three questions propounded by his counsel at the trial are bound to be false. The two answers are wholly irreconcilable and I do not believe that any court can logically hold under such circumstances that his testimony given at the trial would blot out the inference of truth of the charges made against him. If there are they are unworthy of recognition by this Court.

In two of the cases cited in the majority opinion the witnesses were motormen for the defendants where persons had been killed while the motormen were operating the car. In Masterson v. St. Louis Transit Co., supra, the witness claiming his testimony might incriminate him before the coroner did not know whether he had violated a criminal law and was justified in invoking his constitutional privilege. Hill

v. Missouri Packing Co. was another case where the driver of a truck killed a boy. He refused to testify concerning the accident for fear of self-incrimination when his deposition was taken. When he took the witness stand at the trial on behalf of defendant he told how it happened. Counsel for plaintiff tried to impeach him by showing he refused to give his deposition on the ground it might incriminate him. The Court of Appeals of Missouri properly sustained the objection to the question. That case has not the slightest resemblance to this case. In Garrett v. St. Louis Transit Co., another death case where the conductor had previously testified before the coroner that he did not care to answer questions concerning the accident, that the attorney for defendant company had told him not to, the trial court sustained objections to these questions and error was assigned. Justice Woodson in writing the opinion for the court said: "clearly Crady could not have been compelled to have testified before the coroner *if he considered his testimony would incriminate him.*" [219 Mo. 65, 118 S.W. 77.] (Emphasis ours.) He later said:

"* * * That refusal, according to *reason* and all of the authorities, guarantees to the witness all of his constitutional rights to decline to give testimony against himself. So it must logically follow that when a witness * * * testifies or declines to testify,

that testimony and conduct become public property, and may and should be used to contradict and impeach him whenever he subsequently takes the stand and testifies and conducts himself differently from what he did before the coroner even though his subsequent testimony is given in a case in which he is on trial for his life or liberty * * * however self-incriminating his answers may be, even to the extent of asking him if he did not testify differently before the coroner or other court. * * *. To my mind it is an anomalous rule of law that will prevent any one from interposing the personal privilege of a witness to answer questions which might incriminate him, yet will permit a party to successfully object to the introduction of such testimony * * * for the purpose of impeaching him. But, however unreasonable that rule may appear, it has been definitely settled in this state * * * in the case of Masterson v. Transit Co. supra."

If appellant in this case had actually believed when he refused to testify on deposition that his answers would incriminate him, then he unquestionably had the right to stand upon his constitutional right. If appellant feared self-incrimination if he answered the questions propounded in the deposition they could not have been the answers he gave to the three questions at

the trial and if the answers he gave at the trial were untrue, it would no more blot out his action of December 12, 1959, in invoking the protection of Art. 2, section 10 of the State Constitution and the provisions of the Federal Constitution than it would blot out the yesterday on which it occurred. If the answers at the trial were true it still constitutes an irreconcilable conflict in the evidence and should not have and does not have such effect as claimed by the majority. To permit a witness or a party litigant to refuse to answer a proper question upon a false ground strikes at the power and dignity of our courts and at the very heart of justice itself.

The majority opinion further states that in order to connect appellant with the plan consummated in the Pioneer Hotel Room on October 22, 1958, to prevent those present from testifying on the following morning there must be inferred (1) a plan (2) that it was the plan of A. P. Buzard, and (3) that the plan was to prevent those present from testifying the next day. I assert that this is not the law. It did not have to originate in the mind of appellant. He was present. He was vitally interested. Therefore absent a repudiation by him of what transpired there that night it was enough if he agreed to or acquiesced in it. Webster's New International Dictionary, Second Edition, defines a conspiracy as "An agreement, manifesting itself in words or deeds by two or more persons confederate to do an unlawful act or to use unlawful means to do an act which is lawful."

I therefore believe that the plan or agreement arrived at here that evening amounted to a conspiracy to do just exactly what they did do the next morning and he is bound by it, and the statement thereafter of each and every witness present would have been admissible as against each and every other person present.

Was there a plan? Common sense dictates that the meeting in the hotel room by appellant and his attorney with William A. (Bill) Brooks, his wife, and daughter and Harold Brassfield and Millard C. Hardin (employees of the Corporation Commission) was not an accident. It was arranged. What for? Manifestly to do just what they all did do the following morning when every one of them refused to testify as to anything relating to William A. (Bill) Brooks' candidacy for the Corporation Commission. Even conceding arguendo that the rule that an inference may not be predicated upon an inference unless such preceding inference excluded every other reasonable theory as stated in New York Life Ins. Co. v. McNeely, supra, the evidence in the instant case met that requirement.

The majority opinion further states that there is no evidence that Hardin and Brassfield worked for William A. (Bill) Brooks at the instigation or suggestion of

appellant. He did not have to instigate or suggest that they work for him. It is enough if he had knowledge of that fact and acquiesced in it. Appellant was presumably the only one of them beneficially interested in the result of the race. From his participation in the meeting of Brooks, Brassfield and Hardin on October 22, resulting in the suppression of their testimony the following day, it may be reasonably inferred that he feared the effect of their testimony if given.

The above facts and circumstances stand out in full relief and when coupled with appellant's own action in refusing to testify concerning the same thing on December 12, 1959, on the ground that it might tend to incriminate him and later, at the trial, denying under oath that he had done any wrong whatsoever, in my view, eloquently proclaims the truth of the charge made against him in the statement of contest. Furthermore, I believe I have conclusively shown that the trial judge under the facts and circumstances of this case had a perfect right under the law to reject the testimony of appellant at the trial and that the fact that appellant took the stand and testified as he did, did not prevent the trial court from considering his previous contradictory statement of fear of incrimination if he then answered the same questions.

The judgment should be affirmed.