391 P.3d 1198

**The STATE of Arizona, Appellee,**

v.

**Antajuan Stewart CARSON Jr., Appellant.**

**No. 2 CA–CR 2015–0218**

Court of Appeals of Arizona, Division 2.

Filed February 24, 2017

As Corrected March 6, 2017

Judge Miller authored the opinion of the Court, in which Presiding Judge Vásquez concurred and Chief Judge Eckerstrom concurred in part and dissented in part.

## OPINION

MILLER, Judge:

¶1 A jury found Antajuan Carson Jr. guilty of two counts of second-degree murder and two counts of aggravated assault. He was sentenced to concurrent terms, the longest of which was thirteen years. His appeal requires us to determine whether a defendant asserting a mistaken identity defense may also obtain a justification instruction. We conclude that although the defenses are inconsistent, it remains within the province of the jury to determine the facts, and if those facts could support justification then the jury must be instructed on it. Therefore, we affirm as to the aggravated assaults because there was no evidence supporting justification, and reverse the second-degree murder convictions, as to which the slightest justification evidence existed, and remand.

## Factual and Procedural Background

¶2 We view the facts in the light most favorable to Carson, the justification instruction's proponent. *State v. King*, 225 Ariz. 87, ¶ 13, 235 P.3d 240, 243 (2010). Two men, J.M. and S.B., were shot and killed, and a third, B.C., was shot and wounded, outside a party at a residence in October 2013. Carson was indicted as the lone shooter.

¶3 B.C., the surviving victim who came to the party to deejay, testified that he had known Carson only from a social media website and had seen him at a couple of parties. Shortly after B.C. arrived, Carson told B.C. that he was carrying a nine-millimeter pistol that shot like a .22–caliber. Multiple witnesses saw Carson with a black gun at some point during the night.[1]

¶4 An argument occurred inside the house among four or five young men. The parties stipulated that there was "animosity or bad

Mark Brnovich, Arizona Attorney General, Joseph T. Maziarz, Chief Counsel, Phoenix, By Adele G. Ponce, Assistant Attorney General, Phoenix, Counsel for Appellee

Steven R. Sonenberg, Pima County Public Defender, By Erin K. Sutherland, Assistant Public Defender, Tucson, Counsel for Appellant

---

1. One witness also saw a second person at the party with a gun before the fight broke out and asked the person to leave, but she was not sure whether the person left.

blood" between Carson and J.M. arising out of a prior dispute between Carson and J.M.'s brother. The men, including J.M. and S.B., confronted Carson and got into a shoving match or fistfight. Multiple people saw Carson display a gun inside the house.

¶ 5 People began leaving and the confrontation moved outside. As B.C. left through a side door and came around the side of the house, he saw Carson on the ground, surrounded by the same four men including J.M. and S.B. B.C. was not one of the four men. The men were hitting and kicking Carson. B.C. pulled S.B., whom he knew, out of the fray and walked him across the street. B.C. told S.B. that if he wanted to fight Carson, he should fight him one-on-one rather than "jump[ing]" him in a group.

¶ 6 B.C. testified he then had seen the fighting stop, but yelling and screaming continued. Then a man in the area of the fight stood up, and B.C. heard a gun cock. Someone said "He has a gun," and everyone started running. One witness testified the man getting jumped had "[p]ull[ed] out his gun so they could get off him" and then "[h]e started shooting." The man shot J.M., who fell. J.M. tried to get back up and run away, but the man shot him again and he stayed down. B.C. was across the street when the man looked him in the eyes, pointed the gun at him, and shot him in the abdomen.[2] Finally, the man shot and killed S.B. Based on eyewitness interviews and the locations of shell casings at the scene, the shooter moved his hand or changed positions from right to left while firing.

¶ 7 Police officers found the bodies of J.M. and S.B. about one and a half to two blocks apart, in opposite directions from the party house. An autopsy later established J.M. had been shot twice in the back, and S.B. had been shot once in the side of his chest and once in the bottom of his foot. The lack of soot or stippling around the entrance wounds on the decedents indicated either that the shots had been fired from more than three feet away, or that a heavy piece of fabric might have caught all of the soot at closer

range. There was no testimony that the victims were shot with the same gun, but no eyewitnesses reported seeing more than one person shooting that night either. Officers found ten nine-millimeter shell casings and one nine-millimeter live round at the scene. Police never found the murder weapon or weapons.

¶ 8 Officers also found a bloody knife near S.B.'s body. The knife was never tested for DNA or fingerprints. Similarly, blood on a second knife tucked inside S.B.'s belt was not tested. A detective explained that the investigation had not revealed that anyone used a knife during the altercation, and so testing was not necessary.

¶ 9 Carson became a person of interest early in the investigation. Police obtained an arrest warrant for him, and he was apprehended about ten days later in Detroit, Michigan. Several eyewitnesses identified him as the shooter, but several others did not. He did not testify or present evidence in his case-in-chief.

¶ 10 Carson unsuccessfully requested a self-defense justification instruction. Despite the trial court's refusal, in closing both sides indirectly argued self-defense as it pertained to the knives found at S.B.'s body, although Carson's primary contention remained mistaken identity. He was convicted and sentenced as described above. We have jurisdiction over his appeal pursuant to A.R.S. §§ 13–4031 and 13–4033(A)(1).

### Waiver and Standard of Review

¶ 11 Carson timely requested a self-defense instruction in writing, filed a written motion in support of that request, and argued that motion to the trial court during trial while the jury was absent. In its oral ruling denying the instruction, the court relied on *State v. Gilfillan*, 196 Ariz. 396, 998 P.2d 1069 (App. 2000), which had not been cited by the parties. The court explained "[*Gilfillan*] specifically holds that given the defendant denies committing the act with which he is charged, it follows that he could

---

2. B.C. suffered serious injuries. He was the victim as to both aggravated assault charges—one charge of aggravated assault causing serious physical injury, and another charge of aggravated assault with a deadly weapon or dangerous instrument.

not argue self-defense.... So I think that given how the defense has presented this case in that he didn't do it and someone else did it ... I think the court legally cannot give a self-defense instruction."

■ ¶ 12 The state first contends Carson forfeited his objection except for fundamental error review because the trial court, rather than he, cited *Gilfillan*. It relies on *State v. Henderson*, 210 Ariz. 561, ¶ 19, 115 P.3d 601, 607 (2005), which stands for the general proposition that when a defendant fails to object to alleged trial error fundamental error review applies. The state's argument that Carson should have objected specifically to the court's "application of *Gilfillan* to his case," would expand *Henderson*'s reach far beyond its intended purpose of placing the initial burden at trial on a party to make an objection. Moreover, Carson specifically argued it would be "perfectly reasonable" to argue to the jury, " 'He didn't do it, but if you think he did, the facts support self-defense here.' " This argument was sufficient to give the court the opportunity to rule on the issue, which it did. *See State v. Fulminante*, 193 Ariz. 485, ¶ 64, 975 P.2d 75, 93 (1999). We also conclude Carson complied with Rule 21.3(c), Ariz. R. Crim. P., which provides that a party must object to the failure to deliver a particular instruction before the jury retires. The issue is preserved.

¶ 13 We review a court's decision not to give a jury instruction for an abuse of discretion. *State v. Vassell*, 238 Ariz. 281, ¶ 8, 359 P.3d 1025, 1027–28 (App. 2015). A court abuses its discretion if it commits an error of law in exercising that discretion. *State v. Lychwick*, 222 Ariz. 604, ¶ 7, 218 P.3d 1061, 1063 (App. 2009). We review issues of statutory interpretation de novo. *State v. Gear*, 239 Ariz. 343, ¶ 11, 372 P.3d 287, 289 (2016).

## Slightest Evidence of Justification

¶ 14 Use of physical force against another person is justified to protect oneself "when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force," subject to certain inapposite exceptions. A.R.S. § 13–404(A). Justification to use deadly force requires, inter alia, an unlawful use or attempted use of such force by the victim. A.R.S. § 13–405(A). As it pertains to this case, deadly physical force means force whose purpose or effect "is capable of creating a substantial risk of causing death or serious physical injury." A.R.S. § 13–105(14).

■ ¶ 15 Our supreme court has clarified that the "reasonable person" to whom § 13–404(A) refers is "a reasonable person in the defendant's circumstances." *King*, 225 Ariz. 87, ¶ 12, 235 P.3d at 243. Unlike the Model Penal Code and jurisdictions adopting it, in Arizona the defendant's own belief about whether deadly force is necessary to protect himself is not an element of the test. *Compare* Model Penal Code § 3.04(1) (use of force justifiable if actor believes force immediately necessary for purpose of protecting himself), *and State v. Jenewicz*, 193 N.J. 440, 940 A.2d 269, 274–75 (2008) (self-defense claim requires jury to discern whether the defendant had subjective belief deadly force was necessary and whether subjective belief was objectively reasonable), *with King*, 225 Ariz. 87, ¶ 11, 235 P.3d at 242–43. Rather, what a reasonable person would do in the same situation is a "purely objective" inquiry in the final analysis. *See King*, 225 Ariz. 87, ¶¶ 11–12, 235 P.3d at 242–43; *see also Vassell*, 238 Ariz. 281, n.3, 359 P.3d at 1028 n.3.

■ ¶ 16 "A defendant is entitled to a self-defense instruction if the record contains the 'slightest evidence' that he acted in self-defense." *King*, 225 Ariz. 87, ¶ 14, 235 P.3d at 243, *quoting State v. Lujan*, 136 Ariz. 102, 104, 664 P.2d 646, 648 (1983). It is a "low standard." *Id.* ¶ 15. "[A] hostile demonstration, which may be reasonably regarded as placing the accused apparently in imminent danger of losing her life or sustaining great bodily harm," constitutes the slightest evidence of self-defense. *Id.*, *quoting Lujan*, 136 Ariz. at 104, 664 P.2d at 648. Additionally, justification is not an affirmative defense for the defendant to prove; rather, upon the slightest evidence of self-defense it is the state's burden to prove beyond a reasonable doubt that the defendant's conduct was *not* justified. *Id.* ¶ 6, *citing* A.R.S. § 13–205(A).

**Slightest Evidence of Deadly Physical Force by B.C.**

¶ 17 Applying these authorities to the facts of this case, we conclude the trial court correctly denied a justification instruction as to the surviving victim, B.C. At oral argument before this court, counsel listed the evidence Carson argues was sufficient to raise justification.[3]

- A.L., a guest at the party, had seen another person with a gun at the party earlier.

- B.C. had been near the area of the fight, and eyewitness C.Y. said he had seen "everybody" jumping Carson at that point. C.Y. also reported he had attempted unsuccessfully to pull J.M. and S.B. off Carson shortly before the shooting.

- A day later, a neighbor found a partially crushed .40–caliber shell casing two houses away from the area of the fight. A .40–caliber gun was recovered from the passenger-side map pocket of T.C.'s car, in which B.C., together with his girlfriend T.C. and two other people, had ridden to the hospital after he had been shot.

- The .40–caliber gun was not tested to determine whether it had been fired that night. Testing of the DNA on the .40–caliber gun excluded B.C. as a major contributor, but was inconclusive as to whether B.C. could have been a minor contributor.

- T.C. had lied to the police about the gun being in the car.

- A detective testified the nine-millimeter weapon had been discharged in a "fluid-motion shooting."

¶ 18 Carson acknowledges that this evidence does not show B.C. made a "hostile demonstration" toward him, *King*, 225 Ariz. 87, ¶ 15, 235 P.3d at 243, *quoting Lujan*, 136

Ariz. at 104, 664 P.2d at 648; rather, he contends the jury could have inferred that B.C. (1) possessed the .40–caliber gun at the party, (2) assaulted Carson by displaying the gun and firing it at him, (3) placed the gun in T.C.'s car on the way to the hospital, and (4) instructed T.C. to lie to police about the gun to protect him.

¶ 19 Inferences that "mak[e] an argument possible" do not substitute for the slightest evidence, and a justification instruction must rest upon something more than "speculation." *Vassell*, 238 Ariz. 281, ¶ 9, 359 P.3d at 1028; *see also State v. Almeida*, 238 Ariz. 77, ¶ 9, 356 P.3d 822, 825 (App. 2015) (justification instruction required only if "record provides evidence 'upon which the jury could rationally sustain the defense' "), *quoting State v. Strayhand*, 184 Ariz. 571, 587–88, 911 P.2d 577, 593–94 (App. 1995); *Buzard v. Griffin*, 89 Ariz. 42, 48, 358 P.2d 155, 159 (1960) ("An inference is a fact which may be presumed from the proof of the existence or non-existence of other facts."). As *Vassell* illustrates, if there is no evidence for a necessary aspect of a prima facie case of justification, then there is not the slightest evidence of justification. *Compare Vassell*, 238 Ariz. 281, ¶¶ 11–12, 17, 359 P.3d at 1028–29 (instruction not required where justification theory rested on speculative inference—as opposed to slightest evidence—that defendant did not know police officers entering home were officers and not home invaders); *with id.* ¶¶ 22–29 (Eckerstrom, C.J., specially concurring). Because we conclude Carson's justification theory as to B.C. necessarily relies upon speculation, a justification instruction was not warranted.

¶ 20 First, there is no evidence B.C. was involved in the physical altercation with Carson. Of the seven testifying eyewitnesses, none suggested B.C. had punched, kicked, or otherwise attacked Carson.[4] Unlike J.M.,

---

**3.** The list provided at oral argument was more detailed and extensive than that cited in the briefs. Although we generally do not consider arguments made for the first time at oral argument, *Mitchell v. Gamble*, 207 Ariz. 364, ¶ 16, 86 P.3d 944, 949–50 (App. 2004), in our discretion we address all of the evidence cited at oral argument, in order to ensure we are viewing the

evidence in the light most favorable to Carson, *see King*, 225 Ariz. 87, ¶ 13, 235 P.3d at 243.

**4.** In context it is clear that when C.Y. testified "everybody" had been attacking Carson, he did not mean it literally so as to include B.C. or even himself. There were over fifty people at the party that night, many of whom C.Y. had just explained

there was no evidence that there was any bad blood between B.C. and Carson. B.C. only knew Carson from social media and from having seen him at a few other parties. Nor does C.Y.'s testimony that he was attempting to pull some of Carson's assailants out of the fray undermine or contradict B.C.'s testimony that B.C. pulled S.B. off Carson.

¶ 21 Second, the evidence of the .40-caliber shell casing and gun does not make a prima facie justification case. Carson asks us to assume the jury would disregard the testimony of B.C. and T.C. as lies, and instead find that B.C. possessed the gun at the party. Even if we do so, substantial gaps remain that can only be bridged with speculation. None of the seven testifying eyewitnesses reported seeing or hearing a second shooter at any time that evening. Additionally, Carson's counsel agreed at oral argument there was "no evidence" that B.C. ever displayed the gun to Carson. Nor is there any evidence that Carson was aware of B.C. possessing a .40-caliber gun before shooting at him. *See Vassell*, 238 Ariz. 281, n.3, 359 P.3d at 1028 n.3, *citing State v. Andersen*, 177 Ariz. 381, 386, 868 P.2d 964, 969 (App. 1993). The evidence does not "reasonably and clearly support" justification as to B.C., and so the trial court did not abuse its discretion in denying a justification instruction as to him. *Id.*, *quoting State v. Ruggiero*, 211 Ariz. 262, ¶ 10, 120 P.3d 690, 692 (App. 2005).

**Slightest Evidence of Deadly Physical Force by J.M. and S.B.**

■ ¶ 22 As to J.M. and S.B., we conclude there was evidence from which the jury could find that Carson acted in self-defense against those victims. In the light most favorable to Carson, *King*, 225 Ariz. 87, ¶ 13, 235 P.3d at 243, the evidence showed that four men, including J.M. and S.B., had surrounded Carson and were punching and kicking him while he was on the ground. S.B. also had a knife on his person during the assault and another was found near his body. Such a hostile demonstration could be reasonably regarded as placing Carson in imminent danger of

sustaining great bodily harm or losing his life—even more so than in *King*, in which the only hostile demonstration was the victim hitting the defendant's head with a water bottle. *See id.* ¶¶ 15–16.

■ ¶ 23 It is certainly true that other evidence tended to show Carson had not acted in self-defense against J.M. and S.B. As the state points out, J.M. was shot in the back and S.B. was shot in the bottom of the foot, and the two bodies were found a distance away from the scene of the fight in opposite directions. *See State v. Buggs*, 167 Ariz. 333, 337, 806 P.2d 1381, 1385 (App. 1990) (law "settled" that "after a fight has broken off, one cannot pursue and kill merely because he once feared for his life"). The evidence does not resolve, however, whether J.M. and S.B. were shot together or in separate locations at a distance apart. Based on the witness testimony regarding these victims, the jury could find they were shot in relatively close proximity and ran in different directions before dying. And it is not the court's role to resolve conflicts in the evidence in the context of deciding whether to give a justification instruction. *See State v. Plew*, 150 Ariz. 75, 78, 722 P.2d 243, 246 (1986) (instruction required because defendant presented slightest evidence of self-defense, although record was "ambigu[ous]" and in conflict), *disapproved on other grounds by King*, 225 Ariz. 87, ¶¶ 9–12, 235 P.3d at 242–43; *State v. Wright*, 163 Ariz. 184, 185–86, 786 P.2d 1035, 1036–37 (App. 1989) (some evidence of defense of third person necessitated instruction although evidence was disputed and witnesses' testimony "varied greatly"). Rather, because the slightest evidence tended to show justification, the instruction was required, and it was the state's burden to prove beyond a reasonable doubt that Carson was not justified in shooting J.M. and S.B. *See King*, 225 Ariz. 87, ¶ 18, 235 P.3d at 244; *see also* § 13–205.

**Justification and Mistaken Identity**

¶ 24 The state also contends the law precludes a defendant from arguing both justification and mistaken identity, which it charac-

were "standing" around outside and "[w]atching," when he saw "everybody" attacking Car-

son. Additionally, C.Y. did not testify about B.C.'s actions.

terizes as logically inconsistent of necessity. Carson maintains, as he did below, neither law nor logic provides a reason why a defendant should be forbidden from arguing "I didn't do it, but if you don't believe me, then the evidence shows I was justified."

¶ 25 The trial court ruled a justification instruction was barred as a matter of law by *Gilfillan*, 196 Ariz. 396, ¶ 40, 998 P.2d at 1080. But *Gilfillan* is inapposite because the justification claim there was directed at conduct not charged as an offense. Specifically, the defendant was charged with aggravated assault by placing a knife found at the scene against the victim's neck to force her submission to being bound and sexually assaulted. *Id.* ¶¶ 3, 11. Gilfillan testified the victim had come at him with the knife and he had struck her in self-defense. *Id.* ¶ 40. But Gilfillan was not charged with striking the victim. *Id.*

¶ 26 More importantly, Gilfillan denied possessing a knife, much less ever having threatened the victim with it. *Id.* Because Gilfillan denied possessing the knife or threatening the victim with it, this court held, "it follow[ed] that he could not argue self-defense." *Id.* Unlike *Gilfillan*, the evidence that Carson was being beaten by a group of people immediately and while he drew his gun directly relates to the murder charges.

¶ 27 Additional authorities cited by the parties illustrate the requirements that there must be the slightest evidence of justification and it must relate to the offense. In *State v. Miller*, the trial court correctly denied a self-defense instruction when the defendant testified and disclaimed all assaultive behavior and "no evidence" otherwise suggested self-defense. 129 Ariz. 42, 43, 628 P.2d 590, 591 (App. 1981). And in *State v. Ruggiero*, in which the defendant "repeatedly and directly denied" having shot the victim and no evidence suggested deadly force had been immediately necessary to prevent a crime, a crime prevention instruction was properly denied. 211 Ariz. 262, ¶¶ 10–13, 120 P.3d 690, 692–93 (App. 2005). Similarly, in *State v. Dixon*, when the defendant "completely denied shooting the victim," the court correctly denied a self-defense instruction, finding the record "totally devoid of any testimony which would provide the basis for the giving of such an instruction." 15 Ariz.App. 62, 64, 485 P.2d 1179, 1181 (1971).

¶ 28 The defendants in *Miller*, *Ruggiero*, and *Dixon* adopted an "all or nothing" defense, flatly denying they committed the acts giving rise to the charged offenses. The critical distinction in this case, as we have noted, is that Carson argued both that he did not do it, and that if the jury believed he did the shooting, he was justified. And in light of our conclusion above that the record contains the slightest evidence of justification, the record is susceptible to not two, but three possible interpretations: (1) Carson is guilty, (2) Carson shot J.M. and S.B. but was justified in doing so, or (3) Carson was mistakenly identified as the shooter. Both parties have cited one justification case with similar triple possibilities. In *Plew*, 150 Ariz. at 77–78, 722 P.2d at 245–46, our supreme court reversed the trial court's denial of a self-defense instruction when the record contained some evidence to support any of three theories: (1) guilt, (2) self-defense, or (3) an accident. Although some parts of the defendant's testimony suggested he had not fired the gun while other parts suggested he had fired it in self-defense, the court concluded it could not resolve the conflict in the evidence. *See id.* Instead, the court needed only to assess whether there was the slightest evidence of justification, which there was. *Id.* at 78, 722 P.2d at 246. Thus, the defendant was entitled to a justification instruction. *Id.*

¶ 29 The state emphasizes the court's statement in *Plew* that "[a] defendant who denies shooting the victim may not thereafter claim self-defense." *Id.* But this seemingly absolute statement narrows upon closer examination. For the quoted proposition, the *Plew* court cited only *Dixon*, which was itself a case devoid of evidence of justification. *Plew*, 150 Ariz. at 77–78, 722 P.2d at 245–46. Additionally, in *Plew* the defendant inconsistently testified that he did not shoot the victim but also he was "unsure of exactly what transpired," including who shot the victim. *Id.* The ambiguity precluded the appellate court from deciding which portion of his testimony should be believed. *Id.* Instead, the court limited its consideration to "whether the appellant presented the 'slightest evi-

dence' of self-defense." *Id.* Accordingly, we understand the court's statement in *Plew*—that a defendant who denies shooting the victim cannot claim self-defense—to be limited to cases like *Dixon* and *Gilfillan* in which no evidence supports a self-defense theory or the defendant unambiguously testifies he did not engage in the wrongful conduct attributed to him. *Cf. State v. Klokic*, 219 Ariz. 241, ¶¶ 6, 8, 196 P.3d 844, 845–46 (App. 2008) (defendant received justification instructions despite also arguing he never pointed gun at victim).

¶ 30 As Carson points out, case law regarding instructions for lesser-included offenses supports our conclusion. *E.g., State v. Wall*, 212 Ariz. 1, ¶¶ 29–31, 126 P.3d 148, 153 (2006); *State v. McPhaul*, 174 Ariz. 561, 561–62, 851 P.2d 860, 860–61 (App. 1992). In *McPhaul*, the defendant was charged with attempted armed robbery of a gas station. 174 Ariz. at 561–62, 851 P.2d at 860–61. He testified and denied all involvement in the crime, claiming mistaken identity. *Id.* at 562, 851 P.2d at 861. However, the trial evidence also included a surveillance video which arguably did not show a knife in the perpetrator's hands. *Id.* In other words, reasonable evidence supported any of three possibilities: (1) McPhaul committed attempted armed robbery with a knife, (2) McPhaul committed the lesser-included offense of attempted robbery without a knife, or (3) McPhaul was mistakenly identified. *See id.* The trial court denied McPhaul's request for a lesser-included instruction because he had denied all participation in the crime, but this court vacated and ordered a new trial. *Id.* at 562, 564, 851 P.2d at 861, 863. We reasoned there was "nothing inconsistent, illogical or improper about a defendant saying, 'I was not the person who committed the robbery, but even if you do not believe me, the evidence shows that whoever did commit it was not armed.'" *Id.* at 562, 851 P.2d at 861. Just as a lesser-included instruction is required when there is reasonable evidence in the record to support both a mistaken identity defense and a lesser-included defense, so too a justification instruction is required when there is reason-able evidence in the record to support both a mistaken identity defense and a justification defense. *See Plew*, 150 Ariz. at 78, 722 P.2d at 246. A reasonable jury could have concluded Carson was in fact the shooter but that the state had failed to prove beyond a reasonable doubt that he was not acting in self-defense.

¶ 31 We do not find persuasive the state's analogy to a defendant who asserts an entrapment defense while denying the acts underlying the charge, which our supreme court has held impermissible for fear of encouraging perjury or confusing the jury. *See State v. Soule*, 168 Ariz. 134, 136–37, 811 P.2d 1071, 1073–74 (1991). The affirmative defense of entrapment is distinguishable because, by statute, in order to raise it a person "must admit by the person's testimony or other evidence the substantial elements of the offense charged," A.R.S. § 13–206(A), and it is impossible to do so while also denying those elements. *See also McPhaul*, 174 Ariz. at 564, 851 P.2d at 863 (*Soule* is "limited to cases in which the defendant pleads entrapment"). Therefore, we agree with Carson that it is not legally impermissible [5] for a defendant to argue both justification and mistaken identity.

#### Harmless Error

¶ 32 Finally, the state argues the trial court's failure to provide a self-defense instruction was harmless, maintaining Carson "apparently had no intention to argue self-defense to the jurors" when he requested the instruction before trial because he was planning to rely on mistaken identity. Even assuming harmless error review applies where the court erroneously denied a justification instruction despite the slightest evidence of justification, *but see State v. Taylor*, 169 Ariz. 121, 123–24, 817 P.2d 488, 490–91 (1991), the record does not support the state's contention. Even without the benefit of a self-defense instruction, Carson did in fact make self-defense-based arguments in

---

5. Our conclusions are based on the law and should not be construed as a comment on the tactical wisdom of this approach. As trial counsel candidly acknowledged, arguing inconsistent defenses "may not be to some minds the best strategy."

closing related to the knives found at the scene.

## Conclusion

¶ 33 The trial court erred by denying Carson's request for a justification instruction because slight evidence supported a justification theory as to J.M. and S.B. Carson's reliance on a mistaken identity defense does not change this result and the error was not harmless. We affirm Carson's convictions and sentences for aggravated assault against B.C. because there was no evidence of justification relating to B.C.'s conduct. But we reverse Carson's second-degree murder convictions and remand for further proceedings consistent with this opinion.

ECKERSTROM, Chief Judge, concurring in part and dissenting in part:

¶ 34 I concur with my colleagues' well-reasoned opinion in every respect but one: I would conclude that the trial record contains adequate evidence to support Carson's requested self-defense instruction as to the aggravated assault charges against him.

¶ 35 As the majority correctly observes, a trial court must provide a self-defense instruction if the record contains even the "slightest evidence" that the defendant acted in self-defense. *State v. King*, 225 Ariz. 87, ¶ 14, 235 P.3d 240, 243 (2010). In analyzing this question as to the aggravated assault charges, the majority has considered whether the record supports, by an objective standard, any reasonable inference that B.C., the alleged aggravated assault victim, actually used or threatened deadly force against Carson. But that analysis overlooks that we must consider the events not from the perspective of the alleged victim but from the perspective of someone in the defendant's situation.

¶ 36 A defendant may assert self-defense if "a reasonable person *in the defendant's circumstances* would have believed that physical force was 'immediately necessary to protect himself.'" *Id.* ¶ 12, *quoting* A.R.S. § 13-404(A) (emphasis added). Those beliefs need only be reasonable, not correct. "An instruction on self-defense is required when a defendant acts under a reasonable belief; actual danger is not required." *State v. Grannis*,

183 Ariz. 52, 60, 900 P.2d 1, 9 (1995), *disapproved on other grounds by King*, 225 Ariz. 87, ¶¶ 9, 12, 235 P.3d at 242, 243; *accord State v. Lamar*, 144 Ariz. 490, 497, 698 P.2d 735, 742 (App. 1984) (noting justification instruction included possibility of mistake in fact); *cf. State v. Reiner*, 179 Mont. 239, 587 P.2d 950, 956–57 (1978) ("Defendant must demonstrate that his belief in the necessity for using force is reasonable, but even a mistaken belief may be reasonable."); *State v. Abdulkadir*, 293 Neb. 560, 878 N.W.2d 390, 396 (2016) ("A defendant's use of deadly force in self-defense is justified if a reasonable ground existed under the circumstances for the defendant's belief that he or she was threatened with death or serious bodily harm, even if the defendant was actually mistaken about the extent of the danger."); *State v. Rodriguez*, 195 N.J. 165, 949 A.2d 197, 201 (2008) ("Self-defense exonerates a person who kills in the reasonable belief that such action was necessary to prevent his or her death or serious injury, even though this belief was later proven mistaken."), *quoting State v. Kelly*, 97 N.J. 178, 478 A.2d 364, 373 (1984); *State v. Daniels*, 160 Wis.2d 85, 465 N.W.2d 633, 647 (1991) (Callow, J., dissenting) ("It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense ... reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken."), *quoting Crotteau v. Karlgaard*, 48 Wis.2d 245, 179 N.W.2d 797, 800 (1970).

¶ 37 Within a record comprised of eyewitnesses' testimony, often conflicting, as to a fast-moving event that occurred, in part, outdoors at night, two salient facts do not appear to be disputed: (1) Carson did not fire his weapon until after he had been kicked and punched to the ground by numerous assailants and (2) police found two bloody knives on and near the body of one of Carson's targets. From this, a jury could reasonably infer that Carson had been assaulted by numerous persons, some of whom were armed with knives, and that the assault had succeeded in bringing Carson to the ground. In my view, these facts alone should allow a jury to decide whether a reasonable person

under the circumstances would "believe that deadly physical force [was] immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force." A.R.S. § 13-405(A)(2). Those events constitute the "slightest evidence" necessary to entitle Carson to a self-defense instruction.

¶ 38 The majority does not disagree with the above proposition but proceeds to analyze the reasonableness of Carson's actions as to each of the alleged victims. And, the majority finds no evidence in the record from which a juror could infer without speculation that B.C. was an actual assailant. In my view, the evidence renders this individualized approach unnecessary. One witness testified that "everybody just started fighting, just started jumping [Carson]" outside, and he "[p]ull[ed] out his gun so they could get off him" and "started shooting." Furthermore, B.C. himself described the group attacking Carson as "a whole bunch of people." This constitutes at least slight evidence supporting an inference that Carson could have reasonably perceived all those within his immediate vicinity to be assailants.

¶ 39 Even assuming that analyzing B.C.'s actions separately would be necessary under the "slightest evidence" standard, the record provides more than slight evidence from which a jury could infer that Carson reasonably perceived B.C. specifically to be an assailant. By B.C.'s own admission, he was inside when the fight commenced, and he then followed the altercation outside, where he injected himself into the fray. B.C. was also one of three people shot, the other two of whom were indisputably in the group assaulting Carson. And, according to B.C.'s own testimony, Carson "looked at [him] in the eyes" and audibly cocked the gun before

shooting him. From this last testimony, the jury could both infer that B.C. was close enough to Carson to perceive these details even outdoors at night and that Carson specifically rather than randomly targeted B.C.

¶ 40 "In weighing the sufficiency of evidence to justify the giving of an instruction, the inferences which reasonably and logically flow from the evidence are to be considered." *Reichardt v. Albert*, 89 Ariz. 322, 326, 361 P.2d 934, 936–37 (1961).[6] The above evidence allows the logical inference that Carson had targeted and shot the people who had assaulted him and that he reasonably perceived B.C. to be one of those people. The additional facts suggesting B.C. might have possessed a gun and might have attempted to conceal that fact from the police provide further evidentiary support for the requested instruction here. But this more debatable inference was unnecessary for the instruction to issue.

¶ 41 That the state presented substantial evidence countering Carson's self-defense theory is irrelevant to our analysis. *See Andrews v. Fry's Food Stores of Ariz.*, 160 Ariz. 93, 95, 770 P.2d 397, 399 (App. 1989) ("[I]f there is any evidence tending to establish the theory posed in the instruction, it should be given even if there are contradictory facts presented."). And, because the jury and not this court is the ultimate arbiter of credibility, *see Correa v. Curbey*, 124 Ariz. 480, 481, 605 P.2d 458, 459 (App. 1979), B.C.'s version of events—to the extent it might contradict the above inferences—is not relevant either.

¶ 42 Even assuming we were to credit B.C.'s claim that he involved himself in the fight only as a peacemaker, we must analyze the reasonableness of the shooter's perceptions with reference to the circumstances the shooter faced.[7] A defendant being beaten,

---

6. Pursuant to Rule 21.1, Ariz. R. Crim. P., civil law related to jury instructions normally applies to criminal cases. *Accord King*, 225 Ariz. 87, ¶ 13, 235 P.3d at 243.

7. Although the majority cites the correct legal standard for this case, *supra* ¶ 2, in application its opinion fails to state the facts "in the manner which provides the strongest possible support" for the proponent of the justification instructions. *Bliss v. Treece*, 134 Ariz. 516, 520, 658 P.2d 169, 173 (1983). Examples include the majority's repeated observations that Carson possessed a gun,

*supra* ¶¶ 3–4, as well as the majority's acceptance of potentially self-serving and dubious testimony from B.C. about his involvement in the melee outside. Whereas the majority suggests B.C. was "across the street" and away from the conflict when the shooting began, after the fighting had stopped, *supra* ¶¶ 5–6, a proper view of the record suggests B.C. was neither temporally nor spatially removed from the fight. The street in question was a small residential street, meaning B.C. was "pretty close by"; both witness testimony and the location of numerous shell casings

kicked, and potentially stabbed by numerous assailants cannot reasonably be expected to make fine distinctions about the motives and acts of those apparently descending upon him. As Justice Holmes observed long ago, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961 (1921). In this context, B.C. could have reasonably been perceived by the shooter as an assailant, regardless of whether B.C. posed an actual threat.

¶ 43 Another reason exists for reversing the aggravated assault convictions in this case. As the majority acknowledges, the trial court erred by refusing self-defense instructions on the two murder charges. *Supra* ¶¶ 22–23. And, as our supreme court established in *State v. Glissendorf*, an instruction-related error as to one count is not necessarily confined to that count, but may affect other verdicts as well, depending on the circumstances of the case. 235 Ariz. 147, ¶¶ 20–24, 329 P.3d 1049, 1054–55 (2014).

¶ 44 Here, the jury was instructed, on the one hand, that it had to "decide each count separately on the evidence with the law applicable to it, uninfluenced by your decision on any other count." On the other hand, the jury also was instructed it could "consider ... all the ... evidence in the case" when deciding whether the state had proved the defendant's guilt beyond a reasonable doubt. Consistent with these instructions, the jury therefore could have rendered verdicts on the aggravated assault charges while considering the evidence related to the two murders, for which no law on justification was provided.

¶ 45 An error is harmless only if a reviewing court can determine, beyond a reasonable doubt, that it did not contribute to or affect the verdict. *Glissendorf*, 235 Ariz. 147, ¶ 24, 329 P.3d at 1055. In this case, the preclusion of any self-defense instructions on the murder charges necessarily colored and affected

the jury's determinations on the aggravated assault charges, even assuming arguendo that Carson was not otherwise entitled to justification instructions for those separate counts.

¶ 46 As the case was presented below, it logically followed that Carson had committed aggravated assault against B.C. because Carson had not been justified in using deadly physical force against the threat posed by J.M. and S.B. If, however, the requested instructions had been provided as to those two victims, then a factual question would have arisen whether Carson's use of deadly force was reasonable under the circumstances, *see* §§ 13–404(A), 13–405(A), and whether, in the course of defending himself, Carson had acted with the mens rea necessary for assaulting allegedly innocent third parties such as B.C. *See* A.R.S. §§ 13–105(10), 13–1203(A)(1), 13–1204(A)(1), (2). Had justification instructions been given for the murder counts, then Carson could have argued, for example, that he had been negligent, but not reckless, in shooting B.C. *See* §§ 13–105(10), 13–1203(A)(1), 13–1204(A)(1), (2). Carson also could have contended that he was not "aware of and [did not] consciously disregard[ ] a substantial and unjustifiable risk" of injury to B.C., because his shooting of the other two victims was justified and his erroneous shooting of B.C., in that context, did not represent a "gross deviation from the standard of conduct" a reasonable person would observe in the same situation. § 13–105(10)(c). The majority therefore errs by regarding the instruction-related errors as isolated to the murder charges.

¶ 47 For these reasons, I concur with the majority's analysis and disposition of the murder counts but dissent from its opinion affirming the aggravated assault convictions and sentences.

suggested the fighting and shooting occurred within the street itself; and "[p]retty much the entire party" was "out there" when the fighting took place. In addition, C.Y. testified that he was unsuccessful in removing either J.M. or S.B. from the fight and that they were still attacking Carson when he started shooting. Thus, our stan-

dard of review, which requires us to view the evidence in the light most favorable to Carson, does not give us the liberty to disregard this favorable testimony from C.Y. and instead accept the conflicting account offered by B.C. *But see supra* ¶ 20.