[No. 32436. Department Two. October 6, 1953.]

GEORGE S. IKEDA *et al., Respondents and Cross-appellants,* v. NELLIE CURTIS, *Appellant.*[1]

[1]Reported in 261 P. (2d) 684.

*Kennett, McCutcheon & Soderland,* for appellant.

*Helsell, Paul, Fetterman, Todd & Hokanson,* for respondents and cross-appellants.

SCHWELLENBACH, J.—This is an appeal from a judgment for damages for fraud in the sale of a hotel property.

George S. Ikeda and his wife are Japanese. He has spent most of his life doing farming and farm labor in Salinas and San Jose, California. They have seven children, five of whom are living with them. They came to Seattle in November, 1950. At first they lived with his brother-in-law, Tom Funamori, who operated the American Hotel in Seattle. Ikeda did janitor work and operated the elevator. In June, 1951, they purchased the Strand Hotel, located at 2212½ First Avenue.

August 26, 1951, Frank Yamashita, a real-estate salesman representing the Alberg Realty Company, obtained a fifteen-day exclusive listing from Nellie Curtis for the sale of the LaSalle Hotel, located at First and Pike Place Market. The sale price was to be $25,000. The proposed sale included good will, licenses, lease, furniture, and equipment. The

hotel consisted of fifty-seven rooms, fifty-three of which were rentable. Yamashita contacted the Ikedas, who were interested in the purchase. September 15, 1951, an earnest-money receipt was signed by the Ikedas, in which they offered to pay $17,500; $7,500 on the closing of the deal (including $1,000 which they put up as earnest money); and the balance of $10,000 at the rate of $200 per month. Yamashita reported to Mrs. Curtis, who stated that she would have to see her attorney before anything final was done. Yamashita contacted her several times without result, and finally returned the $1,000 to the Ikedas, telling them that the deal was off.

Shortly thereafter, George D. Tucker, representing the Grace Ruud Realty Company, contacted the Ikedas with regard to the sale of the same property. Ikeda went to the hotel once with Yamashita and twice with Tucker, but did not see Mrs. Curtis until October 9th. He was always told that she was too ill to see anyone. During all of this time she was working from eight p.m. to eight a.m. as night clerk at the hotel. Gladys Westbrooke, a colored day clerk, was at the desk during the times Ikeda visited the hotel. There was a card rack at the desk, and she stated, upon inquiry by Ikeda, that there were thirty-four or thirty-five permanent guests. When asked about transient guests, she stated that there were two or three vacanies during the week, but that they were filled up on weekends.

October 6, 1951, an earnest-money receipt and agreement was signed which was practically identical with the one signed September 15th, except that the latter one provided for a down payment of $10,000. The Ikedas testified that when they saw Mrs. Curtis she told them that the monthly income was from $1,900 to $2,200. When the lease, prepared by the owner, Pike Place Investment Company, was presented by Tucker, Ikeda refused to sign it, because of three clauses which his attorney had advised him should be eliminated. This took a few days of negotiating. Finally, in the afternoon of October 16th, Tucker came back with the word that everything was agreeable. He then asked for a check for the $9,000 balance of the down payment. Ikeda

postdated the check to the 17th because that was the day he was to execute the lease.

Ikeda took over the hotel at about ten o'clock in the morning of October 18th. He there met Tucker and Mrs. Curtis, who remained about fifteen minutes and then left. Mrs. Curtis handed him a memorandum of advance rental collections. He counted the rentals and learned that there were only twelve permanent tenants listed. He testified that he was surprised and asked Mrs. Curtis if that were all, and she replied, "That is right."

Ikeda testified that while he was working at the desk the first day, several men came in and asked for girls. In response to a question as to the number, he testified:

"A. About eighteen; seventeen or eighteen men during the daytime while I was at the desk. They come up to ask about the girls and I told them it was under new hand and I don't have any girls and he said: 'You don't have to be scared, I am seaman.' And he pulled out their identification cards and everything, but I say 'I am sorry, I don't have any girls here, see.' And they said 'Where is Mrs. Curtis; where is Gladys?' and I told them 'I don't know, they left no forwarding address; I don't know how to locate them.' That was the same day, you know, but a couple of days later some men came up there and say 'Give me room' and alright I give him room and he went up to room and he called me and he say 'I want a girl,' and I say 'I am sorry, I don't have any girls' and he just took off."

Ikeda's son, Bob, a prelaw student at the University of Washington, clerked the Saturday and Sunday night shifts from October 26th to November 17th. He testified that, during that time, from thirty to fifty men would come each night and ask for girls.

Concerning this situation, Ikeda testified, "I feel ashamed my standing over the desk and answer the same old question all day long. I really feel ashamed of myself." He called his attorney the first day and in a couple of days put out a sign reading, "No Girls". He testified that the transient trade was one or two tenants a day.

This action was commenced, alleging that the defendant represented that the monthly gross income during the sev-

eral years she operated the hotel, was from $1,900 to $2,200; that such representations·were false and known to be false and were made with intent to induce ·the plaintiffs to purchase the property; and that the plaintiffs relied upon such misrepresentations to their damage. We quote paragraphs V and VI of the complaint:

"V.

"Plaintiffs, upon taking possession of the LaSalle Hotel on or about October 16, 1951, learned that the premises had been used by defendant as a house of prostitution and that the major source of income from the business, during the period the said premises were operated by defendant, had been from use of the premises for that purpose. Defendant and her agents fraudulently concealed from plaintiffs the nature of the business conducted by her on said premises.

"VI.

"By reason of the fact that the said LaSalle Hotel has been used for a long time as a house of prostitution, the LaSalle Hotel business has no good will and no value for the operation of a legitimate hotel business. The furniture and furnishings of the said hotel have a value of $5,000.00."

The ledger book for the LaSalle Hotel, kept from September, 1946, until the day of sale, was admitted in evidence. The left-hand sheet shows the income (Mrs. Curtis testified that the book reflects all the income which she received from the hotel) and the right-hand sheet shows the expenses. However, the sheet showing the income has two rows of figures. For example, the income sheet for September, 1951, shows:

LaSalle Hotel
83 Pike Street                                     September 1, 1951

| Date | | | | |
|---|---|---|---|---|
| 1 | $37 | | $50 | Extra $172 |
| 2 | 10 | | 49.50 | |
| 3 | 12 | | 40 | |
| 4 | 30 | | 45 | |
| 5 | 78 | 312 5 wks rent⎱ | 32.50 | |
| | | 405 2 wks rent⎰ | | |
| 6 | 16 | 401 2 wks rent | 27.57 | |
| 7 | 20 | | 41 | |
| 8 | 18 | | 35 | |
| 9 | 10 | | 49.50 | |
| 10 | 18 | | 25 | |
| 11 | 26 | | 40 | |

| | | | |
|---|---|---|---|
| 12 | 40.50 | | 35 |
| 13 | 12 | | 53 |
| 14 | 42 | | 45 |
| 15 | 28 | | 45 |
| 16 | 12 | | 32 |
| 17 | 40 | | 45 |
| 18 | 24 | | 62 |
| 19 | 18 | | 40 |
| 20 | 40 | ⎰ rentals | 41.50 |
| 21 | 45 | ⎱ " | 35 |
| 22 | 47 | | 47.50 |
| 23 | 12 | | 61 |
| 24 | 20 | | 50 |
| 25 | 14 | | 53.50 |
| 26 | 28 | | 37.50 |
| 27 | 40 | | 63 |
| 28 | 52 | | 67.50 |
| 29 | 16 | | 60 |
| 30 | 6 | | 45 |

With reference to the September, 1951 income, she testified:

"Q. Isn't it a fact, Mrs. Curtis, the two columns on the left hand side of the page, that the left hand column represents the income from roomers and the right hand column represents income from the whore house business? . . . A. I refuse to answer. Q. Mrs. Curtis, do you also refuse to answer with respect to the month of October, 1946 on the same ground? A. Yes, all through the book. Q. And on the ground of self-incrimination, is that correct? A. Yes."

She testified to the following income for three months in 1950:

| | Gross | Expenses | Net |
|---|---|---|---|
| October, 1950 ............ | $3,092.50 | $1,126.20 | $1,963.20 |
| November, 1950 .......... | 3,142.50 | 1,168.41 | 1,983.89 |
| December, 1950 .......... | 3,013.50 | 1,421.06 | 1,590.04 |

She explained the large income by testifying that there were days when she rented the rooms two or three times.

Seventy-nine registration cards were admitted. They were for October 6, 8, 9, 10, 12, 15, 16, and 17. There was no testimony as to whether or not they were complete. Each card showed the room number, rate ($2.00), and arrival time. The arrival times were from 10:30 p.m. to 4:00 a.m. The cards also showed that eight, ten, and up to fourteen

rooms were rented in a given night, and that several rooms were rented two and three times in one night. To say the least, Mrs. Curtis did quite a thriving transient business.

The trial court found that the representations as to income were true, and then found:

"IV.

"That the chief source of revenue to defendant from the LaSalle Hotel business during the period of her ownership was from use of the premises for lewdness, assignation and prostitution; that the defendant used the said hotel primarily for her business of trafficking in lewd women and that said hotel was regularly resorted to by prostitutes with defendant's knowledge, consent and approval.

"V.

"That the proof failed to show by clear, convincing, and cogent evidence that the large earnings of the LaSalle Hotel arose from its operation as a house of prostitution; that there was a traffic in that hotel which involved lewd women and many men and that the women were either around the hotel, or available at the hotel, or brought there by men; that the LaSalle Hotel was merely a house of assignation but not a definite house of prostitution."

"VII.

"That defendant did not disclose to plaintiffs the true nature and character of the business conducted by her at the LaSalle Hotel and that the plaintiffs prior to taking possession of said hotel did not know the true nature and character of the business and did not know that the defendant had operated the premises primarily for the illegal purposes described in paragraph IV hereof. That defendant, knowing that plaintiffs were unaware of the true nature and character of said business, fraudulently failed to disclose to and concealed from plaintiffs the true nature and character of the business conducted by her in the said hotel."

The trial court then found that the hotel, at the time of the purchase, had little or no good will, and found damages to plaintiffs in the amount of $7,500. This appeal follows.

The trial judge's reason for finding this to be a house of assignation, rather than a house of prostitution, is explained in his oral opinion at the close of the testimony:

"The other claim made in the complaint is that these large earnings were made because of the proceeds of an illegal business. It is charged the business was the operation of a

house of prostitution. Now, that is not exactly my understanding of a house of prostitution. It is apparent from the testimony, and these cards which I have checked since noon, that there was a traffic there which involved lewd women and many men; and I am inclined to think the women were either around the hotel or available or brought there by these men. That is a house of assignation, if anything, but that is not what I think is a definite house of prostitution where women are maintained on the staff.":

4 Words and Phrases, 476, gives the following definition of "Assignation House":

"An 'Assignation House' is a house resorted to for the purposes of prostitution, and is synonymous with 'bawdy house' or 'brothel'." *McAllister v. Clark*, 33 Conn. 91; *State v. Keithley*, 142 Mo. App. 417, 127 S. W. 406.

Bouvier's Law Dictionary (3d Rev.) defines a "House of Ill-Fame" as "a house resorted to for the purpose of prostitution and lewdness."

Bouvier defines a "Bawdy House" as "a house of ill-fame, kept for the resort and unlawful commerce of lewd people of both sexes;" a "Brothel" as "a bawdy-house; a common habitation of prostitutes."

It would seem that the courts have found that the terms "House of Prostitution," "House of Assignation," "House of Ill-Fame," "Bawdy House," and "Brothel," all have the same legal meaning, and that they have not drawn the fine distinction which was drawn by the trial court.

Error is assigned in the admission of testimony of James R. Ellis. That came about in this manner. Mr. Ellis was one of the attorneys for the plaintiff in the case of Elias v. Curtis, tried in October, 1950, asking for an accounting of the proceeds of the LaSalle Hotel. Mr. Ellis testified that, at the close of the plaintiff's case, the then attorney for Mrs. Curtis (not Mr. Kennett) asked for a recess; that he called Mr. Ellis and his associate to the back of the court room and said, in effect: "I am going to have to blow this whole thing up. You have proved your case for an accounting more than had been anticipated and I am going to have to reveal that this hotel was conducted as a house of pros-

titution rather than an ordinary hotel"; and that as a result of that conversation the case was dropped. This conversation took place out of the hearing of Mrs. Curtis. A motion was made to strike the testimony. The trial court said: "This might be error, but if you want it in the record you may have it." Later, when the complaint and answer in the Elias case were offered, the court said: "It puts us just where we were when Mr. Ellis was testifying. I am still a little dubious about it, but it is your record and your case, if you want the error I am inclined to give it to you."

■ We are satisfied that the admission of the above testimony was error, and, if the case had been tried to a jury, it would have been prejudicial. But the case was tried to the court, and the judge clearly indicated what he thought of it. His findings convince us that he did not consider that testimony in reaching his decision.

■ Error is assigned in admitting evidence that, after respondents took possession of the LaSalle Hotel, men came to the hotel asking for girls; in admitting the seventy-nine registration cards; and in admitting appellant's hotel ledger.

This evidence was proper and material. It is very unusual, in cases of this kind, to have direct testimony concerning actual acts of prostitution. Such charges must, of necessity, be proved by circumstantial evidence.

Appellant contends that the court had no right to draw any inferences because she exercised her constitutional privilege against self-incrimination by refusing to testify as to the source of the income as shown on the right hand column of her ledger book. Appellant relies upon *Sumpter v. National Grocery Co.*, 194 Wash. 598, 78 P. (2d) 1087, 116 A. L. R. 1166. That was a jury case wherein a physician was questioned, without the consent of his patient, in violation of Rem. Rev. Stat., § 1214. We held that the exclusion of such evidence rests in a public policy and is for the general interest of the community, and that such evidence should not have been permitted. The above case is not in point on the issue herein.

■■ The purpose of the privilege against self-incrimination is to protect the witness from compulsory disclosure

of criminal liability. When a witness in a civil suit refuses to answer a question on the ground that his answer might tend to incriminate him, the result sought to be achieved by invoking the constitutional privilege is accomplished. Such refusal cannot be used against him in a subsequent criminal proceeding. However, the trier of facts in a civil case is entitled to draw an inference from his refusal to so testify.

*Fross v. Wotton*, 3 Cal. (2d) 384, 44 P. (2d) 350, was a fraud case. The defendant claimed the privilege against self-incrimination, and refused to answer certain questions. The court, in ruling upon the question of whether or not an inference could be drawn from such refusal, said:

"We are here met by the argument that it is a violation of the constitutional privilege to draw an inference from the refusal to testify when put upon the ground of the privilege against self-incrimination. However, we do not think the inference here drawn constitutes a denial or invasion of that privilege. . . .

"The privilege is not for the benefit of the guilty nor to enable the claimant to prevail in civil suits by means of it. The privilege is to be protected from compulsory disclosure of criminal liability or facts connecting the claimant with the crime. (See *In re Berman*, 105 Cal. App. 37 [287 Pac. 126]). To hold that no inference could be drawn from the refusal of these witnesses to explain their dealings, in the face of so many suspicious circumstances, would be an unjustifiable extension of the privilege for a purpose it was never intended to fulfill."

*Stillman Pond, Inc. v. Watson*, 115 Cal. App. (2d) 440, 252 P. (2d) 717, was an action for a writ of mandate to compel the real-estate commission to vacate an order revoking a real-estate broker's license. In an appeal from an order revoking the license, the court said:

"When Pond, as a witness on cross-examination, was asked what he did with the money he received as a deposit on the sale of the Rites' lot, he refused to answer on the ground that answering the question would tend to incriminate him. One of the issues was whether Pond commingled the deposit money with his money. The question which he refused to answer related directly to that issue. An inference could be drawn from his refusal to answer said

question that he did not immediately place the deposit money in a neutral escrow depositary or in the hands of principles or maintain a trust fund account with a bank or a recognized depositary. (See *Fross v. Wotton,* 3 Cal. 2d 384, 395 [44 P. 2d 350].)"

See, also, *McCooe v. Dighton, S. & S. Street R. Co.,* 173 Mass. 117, 53 N. E. 133, wherein the court said:

"In a civil case, if one of the parties insists upon his privilege to exclude testimony that would throw light upon the merits of the case and the truth of his testimony, we are of opinion that it is a proper subject for comment. *Andrews v. Frye,* 104 Mass. 234, 236. See *Commonwealth v. Smith,* 163 Mass. 411, 430 *et seq.* This being so, it was proper for the court to compel the plaintiff to take the full responsibility of the choice."

Appellant's refusal to testify, taken alone, would not justify a finding that prostitution was practiced in the hotel from which she received a monetary benefit. However, an inference may be drawn from her refusal to so testify, which may be coupled with, and considered with, proper and relevant evidence tending to prove such fact.

■ Complaint is made that there was no clear, cogent, and convincing evidence to support the trial court's finding that the chief source of revenue from the LaSalle hotel business was from the use of the premises for lewdness, assignation, and prostitution, and that the hotel was regularly resorted to by prostitutes with appellant's knowledge, consent, and approval. The testimony of respondents and their witnesses was denied by appellant and her witnesses. Nevertheless, when we consider all of the evidence, we can arrive at no other conclusion than that the trial court's findings were correct. We are satisfied, from the record, that the facts found by the trial court were based upon clear, cogent, and convincing evidence.

Was there a duty to disclose the source of income? The rule is stated in Restatement of the Law under the heading, *Deceit: Business Transactions,* p. 116, § 550:

"One party to a business transaction who by concealment or other action intentionally prevents the other from acquir-

ing material information is subject to the same liability to the other as though he had stated the nonexistence of the matter which the other was thus prevented from discovering,"

and § 551:

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated

"(a) such matters as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."

We held in *Perkins v. Marsh*, 179 Wash. 362, 37 P. (2d) 689, that, under certain circumstances, there is a duty to disclose a material fact even where there was no fiduciary relationship, saying:

"It is true that, in the absence of a duty to speak, silence as to a material fact does not of itself constitute fraud. *Farmers State Bank of Newport v. Lamon*, 132 Wash. 369, 231 Pac. 952, 42 A. L. R. 1072. However, the concealment by one party to a transaction of a material fact within his own knowledge, which it is his duty to disclose, is actual fraud. If appellants intentionally concealed some fact known to them which it was material for respondents to know, that constituted a fraudulent concealment; that is, the concealment of a fact which one is bound to disclose is the equivalent of an indirect representation that such fact does not exist, and differs from a direct false statement only in the mode by which it is made."

Fraudulent misrepresentation may be effected by half-truths calculated to deceive. A representation literally true is actionable if used to create an impression substantially false. 37 C. J. S. 251, Fraud, § 17 b.

In the case at bar, there was no misrepresentation as to the *amount* of the income. The court correctly found that the *amount* of the income was larger than that represented

by appellant. The only representation as to the *source* of the income was that it came from permanent and transient guests. Nothing was said or shown to respondents which would put them on notice concerning the source of the income. They were buying the good will, furniture, and equipment of the hotel. They naturally felt that they were buying a legitimate business. Appellant deceived them to their damage, by failing to reveal the source of the income. Under the peculiar circumstances of this case, it was the duty of appellant to reveal the source of her income to respondents.

■ Complaint is made as to the amount of damages. It is rather significant that the trial court found the damages to be the convenient sum of $7,500, with interest at five per cent per annum from October 16, 1951. This was the amount of the note given, October 16, 1951, to cover the balance of the purchase price. Nevertheless, we cannot say that the court erred in arriving at this amount. All that respondents acquired was some secondhand furniture and equipment, a few permanent guests, and the right to obtain a lease. They were required to start from the beginning in order to build up a business for the hotel.

■ Of course, the sum of $7,500 was not a liquidated amount, and the interest should have commenced at the date of judgment.

We find no merit in the other assignments of error and shall not discuss them.

We find no merit in the cross-appeal and it will be denied.

The judgment is modified to the extent that the second paragraph thereof shall read:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs have and recover judgment against defendant Nellie Curtis in the sum of $7,500, with interest thereon at the rate of six per cent per annum from the date hereof."

The judgment is further modified by striking the third

paragraph thereof, which provided that the judgment could be satisfied by surrendering the $7,500 note.

The judgment, as so modified, is affirmed.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.

November 23, 1953. Petition for rehearing denied.