## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the matter of the Dependency of | No. 83210-7-I |
| A.M.F., | DIVISION ONE |
| a minor child. | PUBLISHED OPINION |

SMITH, A.C.J. — The trial court terminated Y.R.'s parental rights to her son, A.M.F. She contends on appeal that the court erred by drawing a negative inference from her invocation of her Fifth Amendment[1] rights, as well as by finding that A.M.F.'s prospects of integration into a stable and permanent home were diminished by her parental rights and that termination was in his best interest. We conclude that the trial court acted in accordance with Fifth Amendment jurisprudence in drawing negative inferences in the context of this civil case. We also conclude that substantial evidence supports both of the court's challenged findings. We therefore affirm.

**FACTS**

A.M.F. was born to Y.R. and presumed father P.F. on May 8, 2019. At birth, A.M.F. tested positive for amphetamines and opiates and soon went into withdrawal. Y.R. reported to hospital staff having long-standing substance abuse and mental health issues. P.F. reported daily use of methamphetamine.

---

[1] U.S. CONST. amend V.

The Department of Children, Youth, and Families (DCYF) petitioned to establish dependency under RCW 13.34.180, asserting that A.M.F. had no parent capable of adequately caring for him. Both parents eventually entered into agreed dependency orders. A.M.F. was placed with his maternal grandparents. The court ordered chemical dependency evaluation, mental health assessment, and parenting assessments for Y.R. It permitted three three-hour visitations a week supervised by DCYF or his maternal grandparents.

Because the dependency orders were not followed, DCYF petitioned for termination of the parent-child relationship between A.M.F. and both parents in December, 2020. Both parents attended the fact-finding trial in August, 2021. P.F., who was not represented by counsel, did not engage past the morning of the first day. Trial consisted of testimony from Y.R., her father, the social worker who had been assigned the case, and the Court Appointed Special Advocate (CASA) representing A.M.F.'s interests. The CASA supported termination.

The trial court terminated Y.R. and P.F.'s parental interest in A.M.F. and issued a number of findings, both oral and written, explaining its order. Many of those findings are relevant on appeal. Finding of Fact 2.12 states:

> The Court gives credit to the mother for participating in services to a certain degree. [Y.R.] testified that there was no clear road map for reunification, however, with each evaluation she completed, there were recommendations. [DCYF] made referrals and diligently followed up to assist the mother in engaging in the services recommended in the initial evaluations. [Y.R.] never followed through with the recommendations, including the recommendation for inpatient treatment. [Y.R.] reported for inpatient treatment, then left five days later against medical advice. The record contains several instances where the mother began to engage in some of the recommended services, but she never followed through, so the

No. 83210-7-I/3

court concludes that all services were offered to the mother and [Y.R.] was aware. [Y.R.] just did not want to, or was unable to complete the recommended services.

Finding of Fact 2.13 states:

There is little likelihood that conditions will be remedied so that the child can be returned to the mother or alleged father within the near future.

Based on this child's age, needs and developmental level, Social Worker Cortez testified that [A.M.F.]'s near future is one month to six months. Regardless, the Court concludes that conditions will be not remedied within that amount of time. The evidence is clear that the mother is an active user of illicit substances. During trial, when asked by the CASA about her last use, [Y.R.] asserted her Fifth Amendment privilege, and a negative inference was made. [Y.R.] admitted that she is an active user. She has repeatedly shown that she cannot follow through with services. She is inconsistent with visits and unavailable to parent [A.M.F]. There was no evidence that this will change in one month or within six months.

Finding of Fact 2.14 states:

Continuation of the parent-child relationship between the above-named minor child and the mother clearly diminishes the child's prospects for early integration into a stable and permanent home.

The mother argued that even if the Court were to deny the termination petition, [A.M.F.]'s life would not change. This argument was, at times, persuasive, however, the problem is that [A.M.F.]'s current home with his maternal grandparents is not permanent. So long as [P.F.] and [Y.R.]'s parental deficiencies persist, and they are not willing to not remedy those deficiencies, [A.M.F.] continues to be denied a permanent home. While [A.M.F.] may be too young to understand, this knowledge will become more salient with age. [A.M.F.] is adoptable. The existence of the parent-child relationship with [P.F.] and [Y.R.] prevents [A.M.F.] from attaining that permanence.

And the latter part of Finding of Fact 2.17 states:

[Y.R.] is unfit to parent for similar reasons. She is unavailable, actively using, and in denial of [P.F.]' drug use after he admitted active use himself. This poses a risk to the child because the alleged father is in the mother's life.

Y.R. appeals.

3

No. 83210-7-I/4

## ANALYSIS

Y.R. raises three issues on appeal. First, she contests the constitutionality of the negative inference the trial court drew from her invocation of the Fifth Amendment when asked about her drug use. Second, she asserts that substantial evidence did not support the trial court's conclusion that DCYF had met its burden to show that continuation of the parent-child relationship clearly diminished A.M.F.'s prospects for early integration into a stable and permanent home. Finally, she contends that substantial evidence does not support the trial court's conclusion that DCYF met its burden to show by a preponderance of the evidence that termination was in A.M.F.'s best interest.

Finding no error, we affirm.

### Standard of Review

"We review legal questions de novo." Tomlinson v. Puget Sound Freight Lines, Inc., 166 Wn.2d 105, 109, 206 P.3d 657 (2009). We review findings of fact under a substantial evidence standard. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). Substantial evidence is that "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Dickie, 149 Wn.2d at 879. Where the fact at issue must be shown by clear, cogent, and convincing evidence, substantial evidence must demonstrate that fact is " 'highly probable.' " In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting Supove v. Densmoor, 225 Or. 365, 372, 358 P.2d 510 (1961)).

4

We defer to the trial court's advantage in viewing the proceedings and do not reweigh evidence or determine the credibility of witnesses. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Finally, we view the evidence and reasonable inferences drawn from it in the light most favorable to the prevailing party. In re Termination of M.J., 187 Wn. App. 399, 407, 348 P.3d 1265 (2015).

Negative Inference Drawn from Fifth Amendment Statements

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Not only may a person not be compelled to testify, but the Fifth Amendment also prohibits juries in criminal cases from drawing inferences of guilt because of its invocation. Griffin v. California, 380 U.S. 609, 614-15, 85 S. Ct. 1229, 14 L. Ed.2d 106 (1965).

Phrased to apply only to criminal proceedings, the amendment can nonetheless be invoked in civil proceedings to ensure that the State cannot tactically acquire incriminating testimony in a civil matter and later use it in criminal proceedings. To this end, it "privileges [individuals] not to answer official questions put to [them] in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate [them] in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973).

5

Diverging from its application in criminal cases, the exercise in civil litigation of a party's Fifth Amendment privilege "does not protect the invoking party from adverse inferences that may logically be drawn from its exercise." Compare Diaz v. Wash. State Migrant Council, 165 Wn. App. 59, 85-86, 265 P.3d 956, 970 (2011) (inference acceptable in civil context) with Baxter v. Palmigiano, 425 U.S. 308, 317, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) (prohibiting instructing criminal jury that it may draw inference of guilt from defendant's Fifth Amendment invocation). This difference is because of the underlying purpose of the Fifth Amendment: "to protect the witness from compulsory disclosure of criminal liability." Ikeda v. Curtis, 43 Wn.2d 449, 457-58, 261 P.2d 684 (1953). That purpose is fulfilled when a witness in a civil suit refuses to give an answer that may be incriminating because the refusal cannot be used in a subsequent criminal proceeding. Ikeda, 43 Wn.2d at 458.

Here, there was no Fifth Amendment violation. Y.R., in a civil proceeding, invoked her Fifth Amendment protections twice, both times in response to questions about drug use. In both instances, the court warned that it would draw a negative inference from her refusal to answer. It did so. Because her invocations cannot be used in subsequent criminal proceedings to demonstrate guilt, the purpose of the Fifth Amendment to protect a witness from compulsory disclosure of criminal liability has been accomplished. The court did not err.

In the face of this general rule and its clear applicability to her case, Y.R. cites to case law drawing narrow exceptions. She points, for instance, to Garrity

6

v. New Jersey, in which the Court held that where police officers were given "[t]he choice . . . either to forfeit their jobs or to incriminate themselves"—and in which a presumption of guilt would have followed from refusal to testify—the officers' Fifth Amendment rights were violated. 385 U.S. 493, 494-500, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967). Similarly, in Spevack v. Klein, decided on the same day and also cited by Y.R., the Court concluded that an attorney could not be disbarred because of his invocation of the Fifth Amendment. 385 U.S. 511, 517-18, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967).

But, as made clear only a few years later in Baxter v. Palmigiano, those were cases in which "failure to respond to interrogation was treated as a final admission of guilt." 425 U.S. at 318. Baxter, by contrast, concerned a prison disciplinary proceeding in which the decision had to be "based on substantial evidence manifested in the record." 425 U.S. at 317. In this respect, it was importantly dissimilar to Garrity and Spevack, in which the decision to testify was an all or nothing proposition. And it was significantly similar to this dependency matter, which also placed a high evidentiary burden on the State, and in which several days of testimony were heard and dozens of exhibits admitted.

Here, it was not the negative inference alone that led to the court's ultimate conclusion about Y.R.'s drug use. The court's oral findings additionally referenced the social worker's testimony about Y.R.'s active use of heroin and methamphetamine, and evidence of drug use was further supported at trial by testimony from her father, the CASA, and her own statements about addiction.

7

Ample testimony outside of her Fifth Amendment statements supported the court's finding of drug use. Thus, Y.R. did not face the all or nothing decision that faced the witnesses in Garrity or Spevack.

In a similar vein, Y.R. cites a New Jersey decision, New Jersey Div. of Child Protection & Permanency v. S.K. 456 N.J. Super. 245, 268, 193 A.3d 309 (N.J. Super. Ct. App. Div. 2018). The Superior Court of New Jersey's Appellate Division did indeed find a Fifth Amendment violation in negative inferences drawn during termination proceedings in S.K. Id. It reasoned: "the coercive effects the United States Supreme Court found so compelling in Spevack and Garrity pale in comparison to the prospect of losing the Constitutional right to parent and have a relationship with one's children." Id. It is difficult to disagree with the notion that extinguishment of parental rights is a harm of greater magnitude than loss of employment.[2] As made clear by Baxter, though, it was not the mere fact of coercion that motivated the Spevack and Garrity decisions. It was also that the evidentiary burden of the state could be met by the coerced statements alone. That concern is not present here.

Further, not only are we not bound by New Jersey decisions, but the coercive effects of S.K. arose in a very different context than the present case:

---

[2] The notion rings true at a visceral level, but is also supported by constitutional decisional law. It is settled that the Fourteenth Amendment recognizes parenthood as a protected liberty interest. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The right to an occupation is not so firmly ensconced. See Rebecca Haw Allensworth, The (Limited) Constitutional Right to Compete in an Occupation, 60 Wm. & Mary L. Rev. 1111, 1116-23 (2019) (surveying United States Supreme Court rational basis treatment of occupational licensing restrictions).

No. 83210-7-I/9

the defendant had been arrested and charged with several counts of sexual assault and two counts of endangering the welfare of a child, and was in custody when called as a witness. Id. The New Jersey court was also concerned with the impacts of New Jersey law requiring the Department of Children and Families to "immediately report . . . all cases involving suspected criminal conduct" to law enforcement. Id. at 262-63. In such an environment, the coercive impact of the termination proceeding had a direct and necessary connection to pending criminal litigation. That is not the case here.

We will not depart from well-established federal and Washington case law. The trial court did not err in its rulings and findings on this issue.

<u>Prospect of Integration into a Stable and Permanent Home</u>

Y.R. next contends that the trial court erred in finding that the continuing legal relationship between her and A.M.F. diminished his prospects for early integration into a stable and permanent home. We disagree.

Parents possess a fundamental liberty interest under the 14th Amendment[3] in the custody and care of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Washington statute RCW 13.34.180(1) prescribes the elements courts must balance when terminating parental rights. In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013). DCYF must prove six statutory elements by clear, cogent, and convincing evidence before parental rights may be terminated.

---

[3] U.S. CONST. amend. XIV.

9

RCW 13.34.190(1)(a)(i). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.' " In re Dependency of K.R., 128 Wash.2d 129, 141, 904 P.2d 1132 (1995) (quoting Sego, 82 Wn.2d at 739.).

At issue here is whether substantial evidence exists to support a finding of the sixth of the statutory elements: "That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f).[4] This element may be proved in either of two ways. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013). First, "[t]he State can prove prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement." R.H., 176 Wn. App. at 428. Second, "the State can prove the parent-child relationship has a damaging and destabilizing effect on the child that

---

[4] The other five elements are:

    (a) That the child has been found to be a dependent child;

    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided; [and]

    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

RCW 13.34.180(1)(a)-(e).

would negatively impact the child's integration into any permanent and stable placement." R.H., 176 Wn. App. at 428.

RCW 13.34.180(1)(f)'s primary focus is the "continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources." In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004). The existence of prospective adopters who already have a custodial relationship with the child has previously been found to be sufficient to support this element. See In re Dependency of A.D., 193 Wn. App. 445, 458-59, 376 P.3d 1140 (2016) (mother's legal relationship with her children an impediment to permanency and stability where existing foster home parents desired to adopt). A.D. emphasizes that the quality of the relationships between the parent and child are "irrelevant" in this context; the mere existence of that relationship prevents the child from being adopted into a permanent home. 193 Wn. App. at 459.

We are faced with a similar situation here. Since only a few days after his birth A.M.F. has lived with his maternal grandparents. The home is, by all accounts, caring and stable, which Y.R. acknowledges. A.M.F.'s grandparents appear open to adoption. Given these facts, the trial court's finding that DCYF proved the requirements of RCW 13.34.180(1)(f) to a highly probable degree is supported by substantial evidence.

We disagree with Y.R.'s assertion that "[n]othing about A.M.F.'s placement would change if the court denied the termination petition." The legal parent-child

relationship between Y.R. and A.M.F. clearly diminished his prospects of early integration into a stable and permanent home by presenting a continuing uncertainty—the possibility of ongoing legal battles cannot be dismissed. And, as the court acknowledged, his knowledge of his precarious condition "will become more salient [as A.M.F.] age[s]."

We accordingly conclude that the trial court did not err in finding that the sixth element of RCW 13.34.180(1) had been established by the State.

### Best Interest of A.M.F.

Finally, Y.R. contends that the trial court erred in finding that termination was in A.M.F.'s best interest. Because the trial court's conclusion was supported by substantial evidence, we find no error.

Once the state has demonstrated the six statutory elements found in RCW 13.34.180(1) by clear, cogent, and convincing evidence, the trial court must still determine whether termination is in the best interests of the child. RCW 13.34.190(1)(b); In re Dependency of A.V.D., 62 Wn. App. 562, 571, 815 P.2d 277 (1991). The burden of proof for this determination is a preponderance of the evidence. A.V.D., 62 Wn. App. at 571.

"[T]he criteria for establishing the best interests of the child are not capable of specification, each case being largely dependent upon its own facts and circumstances." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Courts therefore consider a broad range of non-exclusive factors. See, e.g., In Re Dependency of J.D.P., 17 Wn. App. 2d 744, 767-68, 487 P.3d

12

960 (2021) (considering parent's inability to rehabilitate over lengthy dependency period); In re Parental Rights to J.B., 197 Wn. App. 430, 439, 387 P.3d 1152 (2016) (considering existing bond between child and grandparents, his prospective adopters); In re Dependency of A.W., 53 Wn. App. 22, 32-33, 765 P.2d 307 (1988) (considering father's alcoholism); In re Dependency of K.R., 128 Wn.2d 129, 145-46, 904 P.2d 1132 (1995) (considering impact of continuing relationship with other parent, also considering stability of housing).

Here, the court found and considered a number of facts before concluding that the termination of the parent-child relationship was in A.M.F.'s best interests. Y.R. followed through with the recommendations of her chemical dependency, mental health, and parenting assessments to different degrees. But despite initially engaging with certain treatment options, she did not complete any of the programs to which she was referred. At trial, her difficulty following through expressed itself in a different manner: the draining nature of the case caused her to leave court during the middle of testimony on one day and fail to appear the next day.

Y.R. also faced continuing struggles with addiction and drug use. This fact was established to a high degree of certainty even without the negative inferences drawn from her Fifth Amendment invocations. Her social worker testified that Y.R.'s continued drug use "throughout the life of the case"; the CASA testified that as of only a few months before trial, Y.R. had confirmed to him her continuing use; and Y.R. testified that she had not attempted to find

treatment since leaving a methadone program while pregnant with A.M.F.'s younger sister. Moreover, she did not view her substance abuse as an impediment to being a good parent.

Additionally, Y.R.'s bond with A.M.F. was not strong, in dramatic contrast to the bond between A.M.F. and his grandparents. Testimony from Y.R's father indicated that she did not regularly see A.M.F.—sometimes going months between visits—did not take full advantage of available visitation opportunities, and sometimes did not engage with A.M.F. while at her parents' home. Multiple witnesses, on the other hand, testified that A.M.F.'s bond with his grandparents was happy and strong.

Finally, her continued relationship with P.F. clearly concerned a number of witnesses and the court. P.F. and Y.R. lived together during trial. P.F. is an active methamphetamine and heroin user with untreated mental health issues. Despite his parenting rights also being at issue in this case, he appeared only at the very beginning of the first day of trial. He exhibited no interest in a relationship with A.M.F. According to the social worker, Y.R. was not troubled by P.F.'s behaviors, despite hoping to raise A.M.F. with him in a two-parent home.

Taken together, the testimony here constitutes substantial evidence supporting the trial court's conclusion that the State had demonstrated that termination of the parent-child relationship was in A.M.F.'s best interest. Y.R.'s continued substance abuse and mental health issues, her difficulty bonding with A.M.F., her lack of concern about her drug use, and her lack of concern about

14

No. 83210-7-I/15

P.F.'s presence all support this finding, particularly in light of A.M.F.'s existing bond with his grandparents.

We therefore affirm.

_Smith, A.C.J._

WE CONCUR:

_Coburn, J._        _Andrus, C.J._